# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PAUL BRAULT, DERIVATIVELY AND ON BEHALF OF CELADON GROUP, INC., | ) ) ) | Case No. 1:18-cv-1424- |
| | ) | **VERIFIED SHAREHOLDER** |
| Plaintiff, | ) ) | **DERIVATIVE COMPLAINT FOR:** |
| | ) | **(1) VIOLATIONS OF SECTION 14(A)** |
| v. | ) | **OF THE SECURITIES EXCHANGE** |
| | ) | **ACT OF 1934;** |
| PAUL WILL, ROBERT LONG, | ) | **(2) BREACH OF FIDUCIARY DUTY;** |
| CATHERINE A. LANGHAM, MICHAEL | ) | **(3) UNJUST ENRICHMENT;** |
| MILLER, KENNETH BUCK, JR., | ) | **(4) ABUSE OF CONTROL;** |
| WILLIAM MEEK, BOBBY PEAVLER, | ) | **(5) GROSS MISMANAGEMENT;** |
| AND BKD, LLP, | ) | **(6) CORPORATE WASTE; AND** |
| | ) | **(7) AIDING AND ABETTING** |
| Defendants, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| And | ) | |
| | ) | |
| CELADON GROUP, INC., | ) | |
| | ) | |
| Nominal Defendant. | ) | |
| | ) | |

Plaintiff Paul Brault ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Celadon Group, Inc. ("Celadon" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Paul Will, Robert Long, Catherine A. Langham, Michael Miller, Kenneth Buck, Jr., William Meek, and Bobby Peavler (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Celadon, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against BKD, LLP ("BKD," and together with Celadon and the Individual Defendants,

1

the "Defendants") for aiding and abetting the foregoing misconduct. As for his complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Celadon, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Celadon's directors and officers and BKD, beginning at least on May 12, 2014 and continuing through the present (the "Relevant Period").

2.      Celadon is a one of North America's twenty largest truckload carriers as measured by revenue, and provides asset-based dry-van truckload carrier and rail services, asset-based temperature-controlled truckload carrier and rail services, asset-based flatbed truckload carrier services, and additional services including brokerage, temperature-controlled, and warehousing services.

3.      On April 5, 2017, *Seeking Alpha* published a report prepared by Prescience Point Research Group ("Prescience") titled, "Celadon Group: A Story That Ends At Chapter 11." The

report, *inter alia*, stated that the Company "has used . . . manipulative accounting practices to hide its insolvent condition from investors and creditors."

4.      On this news, the price per share of Celadon stock fell $0.85, or almost 14%, from the previous day's closing price to close at $5.40 on April 5, 2017.

5.      On April 19, 2017, Prescience published an additional report, titled "FOIA Requests Reveal CGI as the Subject of an Active SEC Investigation," stating that Prescience was denied information about Celadon sought under the Freedom of Information Act ("FOIA") because of an ongoing SEC investigation.

6.      On May 1, 2017, the Company filed a Form 8-K with the SEC stating that BKD was withdrawing its reports for the periods ended on June 30, 2016, September 30, 2016, and December 31, 2016 financial statements of the Company, and that those reports should no longer be relied upon.

7.      On this news, the price per share of Celadon stock fell $2.20, or 55%, from the previous day's closing price to close at $1.80 on May 2, 2017.

8.      On April 2, 2018, the Company issued a press release stating, *inter alia*, that its financial statements for the fiscal year ended June 30, 2016, and the quarters ended September 30, 2016 and December 31, 2016, and related reports of BKD should no longer be relied upon. Moreover, the press release stated that an internal investigation and review by management "identified errors that will require adjustments to the previously issued 2014, 2015, 2016, and 2017 financial statements (and potentially periods prior thereto)."  Moreover, the Company announced that it anticipated that trading in the Company's stock would be halted and the Company would be delisted from the New York Stock Exchange ("NYSE").

9.      Trading in the Company's stock was halted after the close of trading on April 2, 2018.

10.     During the Relevant Period, the Individual Defendants with the help of BKD, for the purpose of hiding Celadon's distressed financial condition, engaged in and/or caused the Company to engage in a scheme consisting of self-dealing, dishonesty, and corporate waste through its transactions with Element Financial Corp. and its affiliates ("Element") and 19th Capital Group, LLC ("19th Capital"), and through other improper accounting actions, including, *inter alia*, an overstatement of second quarter 2016/17 tangible book value and last twelve months profits by an estimated $219 million and falsely stating that an equity contribution to a joint venture with Element was $100 million when it was instead $68.2 million—ultimately leading the Company to have to restate its financial statements for 2014, 2015, 2016, and 2017, and potentially periods prior thereto (the "Accounting Misconduct").

11.     The Accounting Misconduct was done in order to support the false and misleading statements made or caused to be made by the Individual Defendants regarding the Company's business, operations, prospects, and legal compliance.  Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose: (1) the Accounting Misconduct; (2) the investigation by the SEC into the Company's accounting practices; (3) that Celadon's financial statements issued in the years 2014, 2015, 2016, and 2017 contained knowing errors that would necessitate restatements; and (4) that the Company failed to maintain internal controls.

12.     Moreover, the Individual Defendants caused the Company to fail to maintain internal controls.

13.     As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.  The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

14.     Moreover, while the price of the Company's stock was artificially inflated, four of the Individual Defendants engaged in insider sales.

15.     The Individual Defendants' breaches of fiduciary duty and other misconduct, and BKD's aiding and abetting thereof, have subjected the Company, its former Chief Executive Officer ("CEO"), and its former Chief Financial Officer ("CFO"), to being named as defendants in a consolidated federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, and as a result the Company will have to expend many millions of dollars.

16.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of Celadon's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332.  Plaintiff and the Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

18.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or he is an individual who is a citizen of Indiana or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

19.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

23.     Plaintiff is a current shareholder of Celadon.  Plaintiff has continuously held Celadon common stock since during the beginning of the Relevant Period. Plaintiff is a citizen of Texas.

### Nominal Defendant Celadon

24.     Celadon is a Delaware corporation with its principal executive offices at One Celadon Drive, 9503 E. 33rd Street, Indianapolis, IN 46235.  Prior to the close of market on April 2, 2018, Celadon's shares traded on the NYSE under the ticker symbol "CGI."  Trading in the Company's stock is currently halted. Celadon is a citizen of Indiana.

### Defendant Will

25.     Defendant Paul Will ("Will") has served as the Company's CEO from December 2012 to July 2017, and as a Company director from August 2007 to July 2017.  He also served as Chairman of the Board from July 2015 to July 2017.  According to the Company's Schedule 14A filed with the SEC on October 28, 2016 (the "2016 Proxy Statement), as of October 12, 2016, Defendant Will beneficially owned 407,206 shares of the Company's common stock, which represented 1.44% of the Company's outstanding common stock.  Given that the price per share of the Company's common stock at the close of trading on October 12, 2016 was $7.80, Will owned over $3.1 million worth of Celadon stock. Defendant Will is a citizen of Indiana.

26.     For the fiscal year ended June 30, 2016, Defendant Will received $1,353,408 in compensation from the Company.  This included $544,036 in salary, $794,000 in stock awards, and $15,372 in all other compensation.

27.     The Company's 2016 Proxy Statement stated the following about Defendant Will:

**Paul Will**,[1] 50, was named Chairman of the Board ("Chairman") in July 2015 and has served as our Chief Executive Officer ("CEO") since December 2012. He has served as a director since August 2007. Mr. Will served as our President from November 2010 to July 2015. He was Vice-Chairman of the Board from August 2007 to December 2012. He was our COO and President from July 2011 to December 2012. He was our COO, President, and Assistant Secretary from November 2010 to July 2011. Mr. Will also served as our Executive Vice President, Chief Financial Officer ("CFO"), Assistant Secretary, and Treasurer, from February 2004 to November 2010; Executive Vice President, CFO, Secretary, and Assistant Treasurer from May 2002 to January 2004; Executive Vice President, CFO, Assistant Secretary, and Assistant Treasurer from September 2001 to May 2002; Vice President, CFO, Assistant Secretary, and Assistant Treasurer from December 2000 to September 2001; Vice President, CFO, and Secretary from December 1998 to December 2000; Vice President, Secretary, and Controller from September 1996 to December 1998; Vice President and Controller for Celadon Trucking Services, Inc. from January 1996 to September 1996; and Controller from September 1993 to January 1996. Mr. Will is a certified public accountant and serves on the boards of Indianapolis Chamber of Commerce, Indiana Motor Truck Association (IMTA) and EmployIndy (formerly the Indianapolis Private Industry Council). He formerly served as Chairman of the American Trucking Associations' ("ATA") National Accounting and Finance Council. The Board believes that Mr. Will's significant knowledge and thorough understanding of our business operations and industry, which is attributed to his long-term professional experience with our Company, and his financial background qualify him to serve on our Board. Mr. Will's experience serving in various positions within our Company provides us with unique insight into the different challenges and opportunities facing the Company.

28.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Will made the following sales of company stock, and made no purchases of Company stock:

---

[1] Throughout this Complaint, emphasis is contained in the original unless otherwise noted.

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| August 18, 2014 | 28,323 | $21.54 | $610,077 |
| August 19, 2014 | 30,089 | $21.52 | $647,515 |
| August 20, 2014 | 28,324 | $21.32 | $603,867 |
| February 2, 2015 | 57,357 | $24.31 | $1,394,348 |
| February 3, 2015 | 85,050 | $24.20 | $2,058,210 |
| March 3, 2015 | 18,723 | $24.76 | $463,581 |
| March 4, 2015 | 28,389 | $25.27 | $717,390 |
| March 5, 2015 | 23,888 | $25.19 | $601,738 |

29.     Thus, in total, before the fraud was exposed, he sold 300,143 Company shares on inside information, for which he received over $7 million.  His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

**Defendant Peavler**

30.     Defendant Bobby Peavler ("Peavler") served as the Company's Executive Vice President, CFO, and Treasurer from June 2015 to October 2017.  He previously served as the Company's Vice President and Principal Accounting Officer from October 2014 until June 2015, and as the Vice President of Accounting from December 2012 to October 2014.  According to the Company's 2016 Proxy Statement, as of October 12, 2016, Defendant Peavler beneficially owned 27,875 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on October 12, 2016 was $7.80, Peavler owned $217,425 worth of Celadon stock. Defendant Peavler is a citizen of Indiana.

31.     For the fiscal year ended June 30, 2016, Defendant Peavler received $299,720 in compensation from the Company.  This included $174,614 in salary, $119,100 in stock awards, and $6,006 in all other compensation.

32.     The Company's 2016 Proxy Statement stated the following about Defendant Peavler:

> **Bobby Peavler**, 36, was named Executive Vice President, CFO and Treasurer in June 2015.  Mr. Peavler previously served as our Vice President and Principal Accounting Officer from October 2014 until June 2015. He served as Vice President of Accounting from December 2012 to October 2014, Corporate Controller from May 2011 to December 2012, and Assistant Controller from December 2004 to May 2011. Prior to joining the Company, Mr. Peavler worked as Tax Accountant with DeWitt and Shrader, PC in Indianapolis, Indiana.

**Defendant Buck**

33.     Defendant Kenneth Buck, Jr. ("Buck") has served as the Company's Executive Vice President of Business Development since February 2016 and as a Company director since February 2016.  According to the Company's 2016 Proxy Statement, as of October 12, 2016, Defendant Buck beneficially owned 12,500 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on October 12, 2016 was $7.80, Buck owned $97,500 worth of Celadon stock. Upon information and belief, Defendant Buck is a citizen of Maryland.

34.     For the fiscal year ended June 30, 2016, Defendant Buck received $460,012 in compensation from the Company.  This included $232,278 in salary, $99,250 in stock awards, $125,000 in non-equity incentive plan compensation, and $3,484 in all other compensation.

35.     The Company's 2016 Proxy Statement stated the following about Defendant Buck:

> **Kenneth Buck, Jr.**, 57, was named a director in February 2016 and has served as our Executive Vice President of Business Development since February 2016. Mr. Buck served as President of our A&S Kinard Logistics, LLC subsidiary since its acquisition in October 2014. Mr. Buck joined A&S Trucking Service, Inc. (a trucking and logistics company) in February 2005 as an equity partner and became President and CEO of A&S Services Group, LLC the successor entity, in June 2009. He has 32 years of transportation experience in sales, sales management and executive management.  Mr. Buck was Vice President of Sales at Cowan Systems

in Baltimore prior to joining A&S.  The Board believes that Mr. Buck's significant knowledge and thorough understanding of our business operations and industry, which is attributed to his long-term professional experience within the industry, qualify him to serve on our Board.

**Defendant Meek**

36.     Defendant William Meek ("Meek") has served as the Company's President and Chief Operating Officer ("COO") since July 2015, and previously served as the Company's COO from October 2014 until July 2015.  Prior to that, Defendant Meek served as the Company's Executive Vice President, CFO, and Treasurer from April 2012 until October 2014.  According to the Company's 2016 Proxy Statement, as of October 12, 2016, Defendant Meek beneficially owned 142,000 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on October 12, 2016 was $7.80, Meek owned over $1.1 million worth of Celadon stock. Upon information and belief, Defendant Meek is a citizen of Indiana.

37.     For the fiscal year ended June 30, 2016, Defendant Meek received $942,618 in compensation from the Company.  This included $373,403 in salary, $555,800 in stock awards, and $13,415 in all other compensation.

38.     The Company's 2016 Proxy Statement stated the following about Defendant Meek:

**William Meek**, 36, was named President and COO in July 2015. Mr. Meek previously served as our COO from October 2014 until July 2015.  Mr. Meek served as our Executive Vice President, CFO, and Treasurer from April 2012 until October 2014.  He served as our Vice President, Treasurer, and Principal Financial Officer from November 2010 to April 2012. He served Celadon Trucking Services, Inc. as Vice President of Finance and Treasurer from December 2008 to November 2010, Director of Finance from March 2006 to December 2008, and as a Financial Analyst from March 2004 to March 2006. Prior to joining Celadon Trucking Services, Inc., Mr. Meek worked as an auditor for Ernst & Young.

- 11 -

39.     During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Meek made the following sale of company stock, and made no purchases of Company stock.  On February 3, 2015, before the fraud was exposed, Defendant Meek sold 9,500 shares of Company stock on inside information for $23.98 per share, for which he received $227,810.  His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

**Defendant Long**

40.     Defendant Robert Long ("Long") has served as a Company director since December 2014.  He is a member of the Compensation Committee and the Nominating and Corporate Governance Committee, and serves as chairman of the Audit Committee.  According to the Company's 2016 Proxy Statement, as of October 12, 2016, Defendant Long beneficially owned 10,169 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on October 12, 2016 was $7.80, Long owned over $79,318 worth of Celadon stock. Upon information and belief, Defendant Long is a citizen of Indiana.

41.     For the fiscal year ended June 30, 2016, Defendant Long received $129,752 in compensation from the Company.  This included $58,750 in fees earned or cash paid and $71,002 in stock awards.

42.     The Company's 2016 Proxy Statement stated the following about Defendant Long:

**Robert Long**, 62, became a Celadon director in December 2014. Mr. Long is a member of the Compensation Committee and Nominating and Corporate Governance Committee, and serves as chairman of the Audit Committee.  Mr. Long retired from KPMG in December 2006 as managing partner of the firm's Indianapolis office. He began his career in KPMG's Atlanta office in 1977 and served as audit partner for a variety of public and privately held manufacturing,

- 12 -

transportation and financial services companies, including audits conducted in conformity with Public Company Accounting Oversight Board (United States) ("PCAOB") standards.  Since April 2007, he has served on the Audit Committee of the Federal Home Loan Bank of Indianapolis, a public wholesale bank, including serving as the Chairman of the Audit Committee and Audit Committee Financial Expert since September 2009.  He also served as Chairman of the audit committees of Schulman Associates Institutional Review Board, a private-equity owned company that provides independent review services to pharmaceutical and clinical research companies, from October 2009 through December 2014, Beefeaters Holding Company, a private-equity owned producer and distributor of pet treats, from August 2010 through August 2015, and Kenra LLC, a private-equity owned producer and distributor of professional hair care products, from April 2007 through December 2008.  Mr. Long also served as Chairman of the Board of Kenra LLC from January 2009 through December 2010. The Board believes Mr. Long's extensive accounting and public company experience, including his board experience, qualifies him to serve on our Board.

### Defendant Langham

43.      Defendant Catherine A. Langham ("Langham") has served as a Company director since July 2007.  She is a member of the Audit Committee and the Compensation Committee, and serves as chairman of the Nominating and Corporate Governance Committee.  According to the Company's 2016 Proxy Statement, as of October 12, 2016, Defendant Langham beneficially owned 35,408 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on October 12, 2016 was $7.80, Langham owned over $276,182 worth of Celadon stock. Upon information and belief, Defendant Langham is a citizen of Indiana.

44.      For the fiscal year ended June 30, 2016, Defendant Langham received $ 128,502 in compensation from the Company.  This included $ 57,500 in fees earned or cash paid and $71,002 in stock awards.

45.      The Company's 2016 Proxy Statement stated the following about Defendant Langham:

**Catherine Langham**, 58, has served as a director since July 2007. She is a member of the Audit Committee and the Compensation Committee, and chairs the Nominating and Corporate Governance Committee. Ms. Langham is President and Chief Executive Officer of Langham Logistics, Inc. ("LLI"), a global freight management company specializing in expedited transportation, warehousing, and distribution based in Indianapolis, Indiana. Ms. Langham has been with LLI since its inception over twenty-five years ago, and brings extensive experience in the logistics industry to her role as a director. Ms. Langham serves, as a director of The Finish Line, Inc., and as Chairperson of H.H. Gregg. Ms. Langham was a director of Marsh Supermarket, Inc. from 1998 through September 2006 and previously served as a member of the Regions Bank Board of Advisors, as a member of the Board of the Indiana Economic Development Corporation, as Chairperson of the Greater Indianapolis Chamber of Commerce, and as the Chairperson of the Board of the National Association of Women Business Owners, Indiana Chapter. Catherine is the current Chairperson of the Central Indiana Corporate Partnership (CICP). Ms. Langham's experience provides the Board with unique insight into asset light supply chain logistics, business development, corporate community responsibility, and management oversight. The Board believes Ms. Langham's extensive experience serving on Boards coupled with her board leadership, strategic planning, business development, industry knowledge, and management skills qualify her to serve on our Board.

46.    During the period of time when the Company materially misstated information to keep the stock price inflated, and before the scheme was exposed, Defendant Langham made the following sale of company stock, and made no purchases of Company stock.  On June 6, 2014, before the fraud was exposed, Defendant Langham sold 4,500 shares of Company stock on inside information for $22.96 per share, for which she received over $103,320.  Her insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates her motive in facilitating and participating in the scheme.

**Defendant Miller**

47.    Defendant Michael Miller ("Miller") has served as a Company director since February 1992.  He serves as the Board's lead independent director, as a member of the Audit Committee and the Nominating and Corporate Governance Committee, and as chairman of the

Compensation Committee.  According to the Company's 2016 Proxy Statement, as of October 12,

2016, Defendant Miller beneficially owned 44,141 shares of the Company's common stock.  Given

that the price per share of the Company's common stock at the close of trading on October 12,

2016 was $7.80, Miller owned over $344,299 worth of Celadon stock. Upon information and

belief, Defendant Meek is a citizen of New York.

48.     For the fiscal year ended June 30, 2016, Defendant Miller received $144,752 in

compensation from the Company.  This included $73,750 in fees earned or cash paid and $71,002

in stock awards.

49.     The Company's 2016 Proxy Statement stated the following about Defendant

Miller:

> **Michael Miller**, 71, has been one of our directors since February 1992. Mr. Miller
> is our lead independent director, a member of the Audit Committee and Nominating
> and Corporate Governance Committee, and serves as the chairman of the
> Compensation Committee. Mr. Miller has been Chairman of the Board and CEO of
> Aarnel Funding Corporation, a venture capital/real estate company, since 1974, a
> partner of Independence Realty, an owner and manager of real estate properties
> since 1989, and President and CEO of Miller Investment Company, Inc., a private
> investment company, since 1990. Mr. Miller previously served as President,
> Secretary, Treasurer, and director of Morlex, Inc., a "blank check" shell public
> company. Mr. Miller has a long and extensive experience with our business. The
> Board believes that Mr. Miller's extensive history with our Company, coupled with
> his senior executive, operating, corporate governance, finance and financial
> accounting oversight experience from publicly and privately held companies,
> qualify him to serve on our Board.

50.     During the period of time when the Company materially misstated information to

keep the stock price inflated, and before the scheme was exposed, Defendant Miller made the

following sales of company stock, and made no purchases of Company stock.  On June 6, 2014,

Defendant Miller sold 19,875 shares of Company stock for $23.00 per share.  On February 10,

2015, Defendant Miller sold 16,284 shares of Company stock for $25.06 per share.  Thus, in total,

before the fraud was exposed, he sold 36,159 Company shares on inside information, for which he received over $865,202.   His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

**Defendant BKD**

51.     BKD served as the Company's independent registered public accounting firm throughout the Relevant Period. Defendant BKD is a citizen of Indiana.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

52.     By reason of their positions as officers, directors, and/or fiduciaries of Celadon and because of their ability to control the business and corporate affairs of Celadon, the Individual Defendants owed Celadon and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Celadon in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Celadon and its shareholders so as to benefit all shareholders equally.

53.     Each director and officer of the Company owes to Celadon and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

54.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Celadon, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

55.     To discharge their duties, the officers and directors of Celadon were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

56.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Celadon, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Celadon's Board at all relevant times.

57.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this

Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

58.    To discharge their duties, the officers and directors of Celadon were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Celadon were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Indiana, Delaware, and the United States, and pursuant to Celadon's own Code of Business Conduct and Ethics;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how Celadon conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Celadon and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Celadon's operations would comply with all

applicable laws and Celadon's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

59.     Each of the Individual Defendants further owed to Celadon and the shareholders the duty of loyalty requiring that each favor Celadon's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

60.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Celadon and were at all times acting within the course and scope of such agency.

61.     Because of their advisory, executive, managerial, and directorial positions with Celadon, each of the Individual Defendants had access to adverse, non-public information about the Company.

62.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Celadon.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

63.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants and Defendant BKD further aided and abetted and assisted each other in breaching their respective duties.

64.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Section 14(a) of the Exchange Act, and Defendant BKD's aiding and abetting thereof; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; (iii) engage in the Accounting Misconduct; and (iv) to artificially inflate the Company's stock price while four of the Individual Defendants engaged in insider sales.

65.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually

took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Celadon was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

66.     Each of the Individual Defendants and Defendant BKD aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

67.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Celadon, and was at all times acting within the course and scope of such agency.

## CELADON'S CODE OF CONDUCT

68.     Pursuant to the Company's Code of Business Conduct and Ethics (the "Code of Conduct"), the "Code applies to all Celadon directors and employees, including, but not limited to, its principal executive officer; senior financial officer; principal financial officer and controllers, or persons performing similar functions.  Its purpose is to deter wrongdoing."

69.     The Code of Conduct provides, as to "The Standard of Conduct," that:

You must maintain the highest standards of ethical conduct in your work. Behaving ethically means avoiding: actual or apparent conflicts of interest between personal and professional relationships; lying; cheating; and stealing, as well as deception and subterfuge. Behaving ethically also means personal compliance with all applicable governmental laws, rules, and regulations.

- 21 -

Every employee records information of some kind which is used for business purposes. Full, fair, accurate, understandable and timely reporting of information is critical. Any employee who falsifies, alters, or misrepresents data, information, (including financial information), or records/accounts, whether in a filing with an administrative agency or in a public communication, will be severely disciplined if not discharged.

70.    The Code of Conduct provides, as to "Reporting Misconduct," that:

The duty and responsibility to accurately and honestly report information and to not lie, cheat, steal or deceive extends to and includes the duty to report those who breach this duty and responsibility and to provide information or participate in a proceeding wherein someone is alleged to have violated this duty and responsibility.

71.    The Code of Conduct provides, as to whom to report illegal or unethical behavior,

that:

If you have any reason to believe that any employee or director has done anything illegal or unethical, such as dishonestly reporting information or altering Company records, your obligation to report the behavior can be fulfilled by calling (317) 972 – 7000 Ext. 23342 and speaking with Chase Welsh or leaving a recorded message with your name and return phone number. You can also file your report by e-mail addressed to cwelsh@celadontrucking.com. You will never be adversely impacted for making such a good faith report. If you wish to remain anonymous, please call the Celadon Nominating and Corporate Governance Committee at (800) 914-4110 to leave a message.

72.    The Code of Conduct provides, as to "Insider Trading/Access To Non-Public

Information," that:

If you learn information that directly or indirectly relates to Celadon or could impact its value or stock price, you must not share that information with persons who have no business reason to know what you know. It would be illegal for you to personally invest, or cause others (e.g., friends, relatives) to invest for themselves or for you based on that information. Celadon has adopted a separate Insider Trading Policy which includes, among other provisions, specific prohibitions on trading on non-public information or "tipping" others who might trade.

73.    The Code of Conduct provides, as to "Conflicts of Interest," that:

A "conflict" occurs when an individual's private interest interferes or even appears to interfere in any way with the person's professional relationships and/or the interests of Celadon. You are conflicted if you take actions or have interests that may make it difficult for you to perform your work for the Company objectively and effectively. Likewise, you are conflicted if you or a member of your family receives improper personal benefits as a result of your position in the Company (directly or through a company they are employed by or in which they have an ownership interest). If you think you have been, are, or may become conflicted, report the situation to Chase Welsh or by e-mail to cwelsh@celadontrucking.com immediately. The prompt reporting of such situations will be favorably weighted should it be determined that corrective actions need to be administered.

74.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act.  Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, avoid conflicts of interest and unlawful insider trading, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

75.     Celadon is a one of North America's twenty largest truckload carriers as measured by revenue, and provides asset-based dry-van truckload carrier and rail services, asset-based temperature-controlled truckload carrier and rail services, asset-based flatbed truckload carrier services, and other services including brokerage, temperature-controlled, and warehousing services.

76.     The Company operates through subsidiaries including Celadon Trucking Services, Inc. and Quality Companies LLC ("Quality Companies").

77.     Celadon's "Quality Companies" business segment, *inter alia*, facilitates the ownership and leasing of new tractors by independent contractors who contract to provide tractor and driver capacity to the Company and to other fleets, and provides related services.

**The Accounting Misconduct**

78.     In response to financial issues facing the Company, in part due to the sinking trucking industry, the Individual Defendants caused the Company to engage in several improper accounting practices to overstate and manipulate Celadon's reported net income, revenues, and net assets, giving the investing public and Company shareholders a false and misleading impression of the performance of Company and its management.

79.     The Company has had a financing relationship with Element since 2014, where Quality Companies would buy significant amounts of tractors, lease them to independent operators, and then sell the leased equipment to Element.

80.     Per the Company's Form 8-K filed with the SEC on October 19, 2016, Element reportedly purchased approximately $740 million of Quality Companies' lease tractors since the relationship between them began.  Per the terms of their agreement with Element, the Company agreed to cover up to 10% of any losses Element incurred from tractor purchases and the Company agreed to cover any shortfall on lease payments Element received from operators, with such payments being referred to by Celadon as "lease shortfall advances."

81.     Element was obligated to reimburse the Company for lease shortfall advances when Element disposed of the entire tranche of tractors to which the shortfall related.

82.     In 2015, the Company bought approximately $1.5 billion of tractors, with Celadon's debt rising to $587 million, its equipment held for resale rising from $3 million to $102 million, and its property and equipment rising to $788 million.

83.     As noted in the Company's Form 10-K filed with the SEC on September 13, 2016, the "demand for trucking services and the market for used tractors have both weakened" and "[t]hese factors have depressed [Quality Companies'] earnings and created negative cash flows associated with our obligation to advance certain amounts to [Element]."  In other words, due to the Company's lease shortfall advance obligations to Element, the Company was suffering financially.

84.     Also in the September 13, 2016 Form 10-K, Celadon also announced that the Company had signed a Memorandum of Understanding with Element "under which substantially all of Quality's tractors under management owned by such third party financing provider, 19th Capital [which in 2015 purchased a portfolio of the Quality Companies independent contractor leases], and Quality [Companies] would be combined into 19th Capital as a joint venture."

85.     The off-balance sheet joint venture with Element was part of a Company restructuring, and per the joint venture Celadon and Element were equal partners contributing $100 million to the venture.  The joint venture was result of the Company's need to end perfect pay obligations to Element, which were additional demands that the Company pay for its losses in order to continue financing transactions.  Such payments were becoming burdensome for the Company.

86.     In an attempt to avoid such payments, the Individual Defendants structured the joint venture in a manner that significantly benefitted Element, permitting an overly conservative

depreciation schedule for Element's contribution to the joint venture that falsely and misleadingly inflated the value of the joint venture.  Moreover, the Individual Defendants, with the aid of BKD, overstated the value of the Company's contribution to the joint venture.

87.     Such actions disproportionately increased Element's contribution value, enabling the windfall it ultimately received, and falsely inflated the value of the Company's investment in the joint venture.  The inflated value of the Company's investment in the joint venture had the effect of increasing its assets and improving the Company's purported financial condition in its books.

88.     19th Capital was formed by the Board to provide financing to the Company.

89.     In the first quarter of 2016, the Company sought outside investment and closed a deal with 19th Capital, which was formed by the Board as a result of Element notifying the Company that it planned to reduce financing.  19th Capital was created with $6 million in capital contributions with the Company providing $2 million of that amount for a 33.3% interest of Class A Interests in 19th Capital.  Class A Interest holders were entitled to a return of their capital contribution plus a preferred return of 12% per annum.

90.     According to the Company, in less than a year's time, 19th Capital purportedly increased in value to over $27 million despite a suffering trucking industry.

91.     There were substantial conflicts of interest concerning 19th Capital.  Defendants Will, Meek, and Peavler were each given Class B Interests in 19th Capital, entitling them to received a distribution of assets or dividends after Class A holders received their returns.  Thus, Defendants Will, Meek, and Peavler were incentivized to increase 19th Capital's value as much as possible and subsequently sell it.

92.     Celadon announced on December 30, 2016 the closing of its joint venture with Element and its redemption of its investment in 19th Capital.  Per the redemption, Celadon received $4.6 million in cash and $2.5 million in restricted cash for a total of $7.1 million.  As the Company initially contributed $2 million to 19th Capital, the $7.1 million total represented a $5.1 million gain for the Company in about one year.

93.     However, the Company overstated the value of its contribution to its joint venture with Element.  In the Company's January 6, 2017 Form 8-K filed with the SEC, the Company reported that it collected $31.8 million receivable resulting from lease shortfall advances paid to Element.  However, per the joint venture subscription agreement, the Company disclosed that Element provided a "daylight loan" of $31.8 million to the joint venture and the joint venture then gave the $31.8 million to Celadon.  Then, Celadon paid the $31.8 million back to the joint venture to pay off the outstanding contribution from Element.  Essentially, Element gave Celadon $31.8 million, and Celadon gave it back to Element, using the joint venture as an intermediary.  This misleadingly portrayed that Celadon collected its lease shortfall advances and made a $31.8 million contribution to the joint venture, when no value was ever contributed to the joint venture. In light of this, and because the Company was not reimbursed by Element, the Company should not have capitalized this amount, using it to inflate its profits.

94.     KPMG served as the Company's independent auditor until 2012, when the Company was asked by KPMG to restate its financial statements.  KPMG specifically requested that the Company restate its property, plant and equipment and capitalized lease obligations. Celadon subsequently replaced KPMG with BKD.

95.     On April 5, 2017, *Seeking Alpha* published a Prescience report titled, "Celadon Group: A Story That Ends At Chapter 11."  The report, *inter alia*, stated that the Company "has used . . . manipulative accounting practices to hide its insolvent condition from investors and creditors," including the circular transaction involving the $31.8 million Element joint venture daylight loan discussed herein.

96.     On April 19, 2017, Prescience disseminated another report, titled "FOIA Requests Reveal CGI as the Subject of an Active SEC Investigation," stating that Prescience was denied information about Celadon sought under the FOIA because of an ongoing SEC investigation.

97.     On May 1, 2017, the Company filed a Form 8-K with the SEC disclosing that BKD was withdrawing its reports on the financial statements of the Company for the periods ended on the June 30, 2016, September 30, 2016, and December 31, 2016, and that those reports should no longer be relied upon, and that "additional information relating to transactions involving revenue equipment held for sale had come to BKD's attention subsequent to BKD's issuance of its audit report on the Company's June 30, 2016 financial statements and after the issuance of BKD's review reports on the Company's September 30, 2016 and December 31, 2016 interim financial statements."

98.     BKD's withdrawal of its reports was in all likelihood a response to Prescience's reports and the fact that the SEC was investigating the Company.  Its audit should have uncovered the issues presented in Prescience's reports, and thus BKD's withdrawal of prior audited financial statements only in reaction to the SEC investigating the Company and analyst reports questioning BKD's efforts demonstrates their aiding and abetting of the Individual Defendants' misconduct as discussed herein.  Such aiding and abetting is further supported by the fact that the Company's

reported audit fees drastically increased from almost $248,000 to almost $693,000 from the fiscal year ended June 30, 2014 to the fiscal year ended June 30, 2016, despite moving from national accounting power KPMG to the smaller BKD, and such increased costs are seemingly unjustifiable based on the reasons provided by Celadon, such as acquisition work.  Such an increase indicates BKD's aiding and abetting of the Accounting Misconduct came with a price.

99.     On April 2, 2018, the Company issued a press release stating, *inter alia*, that its financial statements for the fiscal year ended June 30, 2016, and the quarters ended September 30, 2016 and December 31, 2016, and related reports of BKD should no longer be relied upon. Moreover, the press release stated that an internal investigation and review by management "identified errors that will require adjustments to the previously issued 2014, 2015, 2016, and 2017 financial statements (and potentially periods prior thereto)."

100.     Such errors (described in more depth herein) concerned, *inter alia*, the Company's "Equipment Held for Sale Transactions," "Element Transactions," "19th Capital Investment," and "Lease Classification."

**False and Misleading Statements**

***May 12, 2014 Form 10-Q***

101.     On May 12, 2014, the Company filed a quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2014 (the "3Q 2013/14 10-Q"), signed by Defendants Will, Meek, and Peavler, which failed to disclose: (1) the Accounting Misconduct; (2) that Celadon's financial statements issued in 2014 contained knowing errors that would necessitate restatements; and (3) that the Company failed to maintain internal controls.

102.     Instead, the 3Q 2013/14 10-Q stated, with regard to Celadon's internal controls:

- 29 -

### Item 4.        Controls and Procedures

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted to the SEC under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that information is accumulated and communicated to management, including the principal executive and financial officers (referred to in this report as the "Certifying Officers"), as appropriate, to allow timely decisions regarding required disclosure based on the definition of "disclosure controls and procedures" in Rule 13a-15(b) under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply judgment in evaluating our controls and procedures.

We have carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report, as required by Rule 13a-15 and 15d-15 under the Exchange Act. This evaluation was carried out under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer. Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.  There were no changes in our internal control over financial reporting that occurred during the period covered by this report that have materially affected or that are reasonably likely to materially affect our internal control over financial reporting.

103.    Moreover, the 3Q 2013/14 10-Q stated, with regard to dealings with Element:

### 14.        Sale of Lease Portfolio Assets

On March 31, 2014 we sold a portion of our independent contractor lease portfolio and associated assets to Element Financial Corporation ("Element") for $52.6 million.  The portfolio was comprised of 588 leases and tractors with independent contractors in service with us and other partner carriers.  Under the agreement we will continue to service the lease contracts for the duration of each individual lease.  As part of the transaction, we have also entered into a Program Agreement with Element under which Element will provide financing for the renewal and expansion of the transportation assets operated by independent lessees under contract to Celadon.

104.    Attached to the 3Q 2013/14 10-Q were certifications pursuant to Rule 13a-14(a)

and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by

Defendants Will and Meek attesting to the accuracy of the 3Q 2013/14 10-Q.

### *September 15, 2014 Form 10-K*

105.    On September 15, 2014, the Company filed an annual report on Form 10-K with the SEC for the fiscal quarter and year ended June 30, 2014 (the "2013/14 10-K"), signed by Defendants Will, Meek, Peavler, Miller, Heyworth, and Langham, which failed to disclose: (1) the Accounting Misconduct; (2) that Celadon's financial statements issued in 2014 contained knowing errors that would necessitate restatements; and (3) that the Company failed to maintain internal controls. that:

106.    Instead, the 2013/14 10-K stated, with regard to Celadon's internal controls:

**EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted to the SEC under the Securities Exchange Act of 1934, as amended (the Exchange Act), is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that information is accumulated and communicated to management, including the principal executive and financial officers (referred to in this report as the Certifying Officers), as appropriate, to allow timely decisions regarding required disclosure based on the definition of "disclosure controls and procedures" in Rule 13a-15(b) under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply judgment in evaluating our controls and procedures.

Based upon that Evaluation, our Certifying Officers have concluded that, as of June 30, 2014, the Company's disclosure controls and procedures are effective.

107.    Moreover, 2013/14 10-K stated, with regard to dealings with Element:

In addition to drivers retained as employees, we also utilize the services of independent contractors who supply one or more tractors and drivers to provide transportation services for us. Independent contractors pay their own tractor expenses, fuel, maintenance, and driver costs and must meet our specified guidelines with respect to safety. Historically, we have offered a lease-purchase

program to independent contractors under which we would lease equipment to the independent contractor, with the lease payments being applied towards the eventual purchase of the equipment. In March of 2014, we entered into a transaction with Element Financial Corp. ("Element"), under which Element purchased our portfolio of independent contractor leases and will directly provide financing to our independent contractors going forward. We believe the Element transaction will allow us to continue expanding our use of independent contractors while reducing the administrative burdens associated with administration of independent contractor leases.

As of June 30, 2014, 488 independent contractors provide a combined 13.6% of our tractor capacity. If we are successful in our continued efforts to recruit independent contractors, we anticipate that our utilization of independent contractors will increase during fiscal 2015.

\* \* \*

Our principal sources of liquidity are cash generated from operations, bank borrowings, capital and operating lease financing of revenue equipment, and proceeds from the sale of used revenue equipment. Our transaction with Element in fiscal 2014 allowed us to reduce our debt, and we continue to view reduction of debt as a priority.

\* \* \*

The Company had debt, excluding lines of credit, of $13.3 million at June 30, 2014, of which $3.7 million is classified as current. Debt includes revenue equipment installment notes of $2.3 million with an average interest rate of 4.12 percent at June 30, 2014 due in monthly installments with final maturities at various dates through June 2019. Included in debt is $5.9 million related to our escrow agreement from the sale of lease purchase units sold to Element Financial Corp. that carry no interest rate.

108.   Attached to the 2013/14 10-K were SOX Certifications signed by Defendants Will and Meek, attesting to the accuracy of the 2013/14 10-K.

**October 28, 2014 Proxy Statement**

109.   On October 28, 2014, the Company filed a Schedule 14A with the SEC (the "2014 Proxy Statement") that failed to disclose: (1) the Accounting Misconduct; (2) that Celadon's financial statements issued in 2014 contained knowing errors that would necessitate restatements;

and (3) that the Company failed to maintain internal controls.[1]

110.    Moreover, due to the Individual Defendants' violations of the Code of Conduct, the 2014 Proxy Statement was false and misleading in representing that Celadon adopted the Code of Conduct, and that it applied to Celadon's officers, directors, and employees.

### November 10, 2014 Form 10-Q

111.    On November 10, 2014, the Company filed a quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2014 (the "1Q 2014/15 10-Q"), signed by Defendants Will and Peavler, and Leslie A. Tarble ("Tarble), the Company's Principal Financial Officer at the time, which failed to disclose: (1) the Accounting Misconduct; (2) that Celadon's financial statements issued in 2014 contained knowing errors that would necessitate restatements; and (3) that the Company failed to maintain internal controls.

112.    Instead, the 1Q 2014/15 10-Q stated, with regard to Celadon's internal controls:

### Item 4.          Controls and Procedures

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted to the SEC under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that information is accumulated and communicated to management, including the principal executive and financial officers (referred to in this report as the "Certifying Officers"), as appropriate, to allow timely decisions regarding required disclosure based on the definition of "disclosure controls and procedures" in Rule 13a-15(b) under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply judgment in evaluating our controls and procedures.

---

[1] Plaintiff's allegations with respect to the misleading statements in the 2014-2016 Proxy Statements (as defined herein) are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

We have carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report, as required by Rule 13a-15 and 15d-15 under the Exchange Act. This evaluation was carried out under the supervision and with the participation of our management, including our Chief Executive Officer and Principal Financial Officer. Based upon that evaluation, our Chief Executive Officer and Principal Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.  There were no changes in our internal control over financial reporting that occurred during the period covered by this report that have materially affected or that are reasonably likely to materially affect our internal control over financial reporting.

113.     Moreover, the 1Q 2014/15 10-Q stated, with regard to dealings with Element:

We had debt, excluding capital leases, of $119.3 million at September 30, 2014, of which $104.3 million relates to our line of credit. Debt includes revenue equipment installment notes of $2.1 million with an average interest rate of 4.2 percent at September 30, 2014, due in monthly installments with final maturities at various dates through June 2019. Included in debt is $9.1 million related to our escrow agreement from the sale of lease purchase units sold to Element Financial Corp. that carries no interest rate.

* * *

Pursuant to the March 2014 transaction with Element Financial Corp. ("Element"), we routinely sell equipment to Element for use by independent contractors. Total sales proceeds from these transactions during the first quarter of fiscal 2015 were $46.1 million. The primary purpose of these transactions is to reduce our debt, facilitate continued use of independent contractors, and reduce the administrative burdens associated with the administration of independent contractor leases. In accordance with ASC 605-45, the Company recorded these transactions on a net basis as an agent versus grossing up the sales in revenue and costs of goods sold as a principal. The net gain in the first quarter of 2015 as a result of these transactions was $3.5 million. As the transactions with Element began during the second half of fiscal 2014, no comparable sales proceeds were realized during the first quarter of fiscal 2014.

* * *

Depreciation and amortization, consisting primarily of depreciation of revenue equipment, decreased to $15.6 million, or 8.0% of total revenue and 9.9% of freight revenue, for the first quarter of fiscal 2015, compared to $16.1 million, or 9.2% of total revenue and 11.3% of freight revenue, for the first quarter of fiscal 2014.  These decreases were primarily attributable to a decrease in owned tractors

- 34 -

from the sale of our lease purchase portfolio to Element Financial Corporation in the third quarter of fiscal 2014.

* * *

Gains on the disposition of equipment increased from $1.2 million in the first quarter of fiscal 2014 to $4.6 million in the first quarter of fiscal 2015. The gain on disposition of equipment for the first quarter of fiscal 2015 is comprised of two components. The first component relates to the disposition of equipment through our agreement with Element in which we sell our lease purchase units. This component generated $3.5 million in gain.

114.    Attached to the 1Q 2014/15 10-Q were SOX Certifications signed by Defendant Will and Tarble, attesting to the accuracy of the 1Q 2014/15 10-Q.

***February 9, 2015 Form 10-Q***

115.    On February 9, 2015, the Company filed a quarterly report on Form 10-Q with the SEC for the fiscal quarter ended December 31, 2014 (the "2Q 2014/15 10-Q"), signed by Defendants Will and Peavler, and Tarble, which failed to disclose: (1) the Accounting Misconduct; (2) that Celadon's financial statements issued in years 2014 and 2015 contained knowing errors that would necessitate restatements; and (3) that the Company failed to maintain internal controls.

116.    Instead, the 2Q 2014/15 10-Q stated, with regard to Celadon's internal controls:

**Item 4.        Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted to the SEC under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that information is accumulated and communicated to management, including the principal executive and financial officers (referred to in this report as the "Certifying Officers"), as appropriate, to allow timely decisions regarding required disclosure based on the definition of "disclosure controls and procedures" in Rule 13a-15(b) under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls

- 35 -

and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply judgment in evaluating our controls and procedures.

We have carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report. This evaluation was carried out under the supervision and with the participation of the Certifying Officers. Based upon that evaluation, our Certifying Officers concluded that our controls and procedures were effective as of the end of the period covered by this report.

117.   Moreover, the 2Q 2014/15 10-Q stated, with regard to dealings with Element:

We routinely sell equipment to Element Financial Corp. ("Element") under our agreement with Element for use by independent contractors. Total net sales proceeds from these transactions during the fiscal 2015 period were $127.7 million. The primary purpose of these transactions is to reduce our debt, facilitate continued use of independent contractors, and reduce the administrative burdens associated with the administration of independent contractor leases. In accordance with ASC 605-45, we recorded these transactions on a net basis as an agent versus grossing up the sales in revenue and costs of goods sold as a principal. The net gain in the fiscal 2015 period as a result of these transactions was $5.6 million. As the transactions with Element began during the second half of fiscal 2014, no comparable sales proceeds were realized during the first quarter of fiscal 2014.

* * *

Equipment held for resale relates to equipment purchased to sell to Element.  There are timing differences between when we fund for equipment and the equipment is seated and sold to Element.  This balance relates to units that were subsequently sold to Element.

* * *

Depreciation and amortization, consisting primarily of depreciation of revenue equipment, increased to $33.3 million, or 8.0% of total revenue and 9.7% of freight revenue, for the fiscal 2015 period, compared to $32.8 million, or 8.9% of total revenue and 11.0% of freight revenue, for the fiscal 2014 period. The increase in absolute dollars was primarily attributable to an increase in owned tractors and trailers as a result of acquisitions subsequent to the fiscal 2014 period.  Offsetting the increase was a decrease in owned tractors from the sale of our lease purchase portfolio to Element in the third quarter of fiscal 2014. Revenue equipment held under operating leases is not reflected on our balance sheet and the expenses related to such equipment are reflected on our condensed consolidated statements of

- 36 -

income in revenue equipment rentals, rather than in depreciation and amortization and interest expense, as is the case for revenue equipment that is financed with borrowings or capital leases. As we refresh older units from acquisitions during the remainder of fiscal 2015, we expect depreciation to increase in connection with the increased equipment costs.

Gain on sale of revenue equipment increased from $1.9 million in the fiscal 2014 period to $8.6 million in the fiscal 2015 period. This increase is primarily attributable to the sale of equipment as we continued to integrate acquired companies during the fiscal 2015 period and replace older equipment. Equipment sold to Element has also contributed to this increase.

118.    Attached to the 2Q 2014/15 10-Q were SOX Certifications signed by Defendant Will and Tarble, attesting to the accuracy of the 2Q 2014/15 10-Q.

**May 11, 2015 Form 10-Q**

119.    On May 11, 2015, the Company filed a quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2015 (the "3Q 2014/15 10-Q"), signed by Defendants Will and Peavler, and Tarble, which failed to disclose: (1) the Accounting Misconduct; (2) that Celadon's financial statements issued in years 2014 and 2015 contained knowing errors that would necessitate restatements; and (3) that the Company failed to maintain internal controls.

120.    Instead, the 3Q 2014/15 10-Q stated, with regard to Celadon's internal controls:

**Item 4.          Controls and Procedures**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted to the SEC under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized, and reported within the time periods specified by the SEC's rules and forms, and that information is accumulated and communicated to management, including the principal executive and financial officers (referred to in this report as the "Certifying Officers"), as appropriate, to allow timely decisions regarding required disclosure based on the definition of "disclosure controls and procedures" in Rule 13a-15(b) under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control

objectives, and management is required to apply judgment in evaluating our controls and procedures.

We have carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report. This evaluation was carried out under the supervision and with the participation of the Certifying Officers. Based upon that evaluation, our Certifying Officers concluded that our controls and procedures were effective as of the end of the period covered by this report.

121.    Moreover, the 3Q 2014/15 10-Q stated, with regard to dealings with Element:

We routinely sell equipment to Element Financial Corp. ("Element") under our agreement with Element for use by independent contractors. Total net sales proceeds from these transactions during the nine months ended March 31, 2015 period were $208.1 million. The primary purpose of these transactions is to reduce our debt and facilitate continued use of independent contractors. In accordance with ASC 605-45, we recorded these transactions on a net basis as an agent versus grossing up the sales in revenue and costs of goods sold as a principal. The net gain as a result of these transactions in the three and nine month periods ended March 31, 2015 was $7.0 million and $12.6 million, respectively.  As of March 31, 2014 we made our first sale to Element for $52.6 million.  Those units consisted entirely of previously operated Celadon units.

* * *

Equipment held for resale relates to equipment purchased to sell to Element.  There are timing differences between when we fund the purchase of such equipment and when the equipment is seated and sold to Element.  Equipment held for resale was subsequently sold to Element.

* * *

Gain on sale of revenue equipment increased from $2.3 million in the third quarter of fiscal 2014 to $5.6 million in the third quarter of fiscal 2015.  This increase is due primarily to the equipment that we sell to Element. The increase was slightly lower than expected due to constrained delivery of new replacement equipment. We expect gain on sale to increase slightly over the next six months, although gain on sale can vary significantly due to a variety of factors, including availability of replacement equipment.

122.    Attached to the 3Q 2014/15 10-Q were SOX Certifications signed by Defendant

Will and Tarble, attesting to the accuracy of the 3Q 2014/15 10-Q.

- 38 -

*September 10, 2015 Form 10-K*

123.    On September 10, 2015, the Company filed a quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2015 (the "2014/15 10-K"), signed by Defendants Will, Peavler, Miller, Long, and Langham, which failed to disclose: (1) the Accounting Misconduct; (2) that Celadon's financial statements issued in years 2014 and 2015 contained knowing errors that would necessitate restatements; and (3) that the Company failed to maintain internal controls.

124.    Instead, the 2014/15 10-K stated, with regard to Celadon's internal controls:

**Item 9A.       Controls and Procedures**

**EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted to the SEC under the Securities Exchange Act of 1934, as amended (the Exchange Act), is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that information is accumulated and communicated to management, including the principal executive and financial officers (referred to in this report as the Certifying Officers), as appropriate, to allow timely decisions regarding required disclosure based on the definition of "disclosure controls and procedures" in Rule 13a-15(b) under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply judgment in evaluating our controls and procedures.

Based upon that Evaluation, our Certifying Officers have concluded that, as of June 30, 2015, the Company's disclosure controls and procedures are effective.

125.    Moreover, the 2014/15 10-K stated, with regard to dealings with Element:

*Quality Companies*.  In March of 2014, we entered into a transaction with Element Financial Corp. ("Element"), under which Element purchased our portfolio of independent contractor leases and will directly provide financing to our independent contractors. The portfolio was held in our Quality Companies business unit ("Quality"). Quality diversifies our income stream by providing a suite of "tractors under management" services, which includes tractor purchasing

and sales, maintenance, loan and lease servicing, repossession, and other services to independent contractor drivers and their finance providers. Quality has grown significantly from 750 tractors under management at the end of fiscal 2013 to 4,900 tractors under management at the end of fiscal 2015. We believe Quality significantly complements our core freight business lines for several reasons. First, we believe the market for tractors under management is growing faster than the general truckload freight market. Second, our consolidated buying power, warranty plans, maintenance experience, and insurance expertise allow us to provide a differentiated services suite to independent contractors and third-party fleets that may not have capacity or desire to build these skill sets internally. Third, the Quality business, to the extent pursued off-balance sheet with financial partners such as Element, has the prospect for more consistent margins, lower capital expenditures and higher return on invested capital than our traditional truckload business. Fourth, we are able to access an entrepreneurial and high-performing segment of the professional truck driving population that otherwise may go unserved generally or untapped by us. For these reasons we have identified the continued growth of Quality as a strategic priority.

* * *

Gain on sale of revenue equipment increased from $6.6 million in fiscal 2014 to $23.6 million in fiscal 2015. This increase is due primarily to the equipment that we sell to Element. We expect gain on sale to increase slightly over the next six months, although gain on sale can vary significantly due to a variety of factors, including availability of replacement equipment.

* * *

We routinely sell equipment to Element Financial Corp. ("Element") under our agreement with Element for use by independent contractors. Total net sales proceeds of units purchased with the intent to sell during the fiscal year ended June 30, 2015 were $329.0 million. In accordance with ASC 605-45, we recorded these transactions on a net basis as an agent versus grossing up the sales in revenue and costs of goods sold as a principal. The net gain as a result of these transactions in the fiscal year ended June 30, 2015 was $21.5 million. We had sales of previously operated Celadon units to Element of $65.3 million for the fiscal year ended June 30, 2015 compared to $76.5M for the fiscal year ended June 30, 2014. All sales to Element for the fiscal year ended June 30, 2014 consisted entirely of previously operated Celadon units.

126. Attached to the 2014/15 10-K were SOX Certifications signed by Defendants Will and Peavler, attesting to the accuracy of the 2014/15 10-K.

- 40 -

*October 27, 2015 Proxy Statement*

127.    On October 27, 2015, the Company filed a Schedule 14A with the SEC (the "2015 Proxy Statement") that failed to disclose: (1) the Accounting Misconduct; (2) that Celadon's financial statements issued in years 2014 and 2015 contained knowing errors that would necessitate restatements; and (3) that the Company failed to maintain internal controls.

128.    Moreover, due to the Individual Defendants' violations of the Code of Conduct, the 2015 Proxy Statement was false and misleading in representing that Celadon adopted the Code of Conduct, and that it applied to Celadon's officers, directors, and employees.

*November 9, 2015 Form 10-Q*

129.    On November 9, 2015, the Company filed a quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2015 (the "1Q 2015/16 10-Q"), signed by Defendants Will and Peavler, which failed to disclose: (1) the Accounting Misconduct; (2) that Celadon's financial statements issued in years 2014 and 2015 contained knowing errors that would necessitate restatements; and (3) that the Company failed to maintain internal controls.

130.    Instead, the 1Q 2015/16 10-Q stated, with regard to Celadon's internal controls:

**Item 4.          Controls and Procedures**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted to the SEC under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that information is accumulated and communicated to management, including the principal executive and financial officers (referred to in this report as the "Certifying Officers"), as appropriate, to allow timely decisions regarding required disclosure based on the definition of "disclosure controls and procedures" in Rule 13a-15(b) under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only

- 41 -

reasonable assurance of achieving the desired control objectives, and management is required to apply judgment in evaluating our controls and procedures.

We have carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report, as required by Rule 13a-15 and 15d-15 under the Exchange Act. This evaluation was carried out under the supervision and with the participation of our management, including the Certifying Officers. Based upon that evaluation, our Certifying Officers concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.

131.     Moreover, the 1Q 2015/16 10-Q stated, with regard to dealings with Element and

19th Capital:

Since March of 2014, Quality has placed the majority of its tractors under management through a Program Agreement and Service Agreement with Element. In September 2015 we entered into a similar arrangement with 19th Capital (together with Element, the "Quality Financing Parties"). The 19th Capital arrangement differs from the Element arrangement in that we hold a minority equity interest in 19th Capital and, as a result, indirectly participate in the economics of 19th Capital's operations, whereas with Element we do not.

Pursuant to these agreements, we use our volume purchasing power to purchase tractors, which we then sell to the Quality Financing Parties. Quality then refers independent contractor drivers or fleets to the Quality Financing Parties, who lease tractors to such independent contractors or fleets or finance the drivers' purchase of tractors. Each Quality Financing Party has credit profile, customer concentration, and other business goals and restrictions, and may not grow, be able to obtain financing on acceptable terms, or even continue to finance tractors.

132.     Attached to the 1Q 2015/16 10-Q were SOX Certifications signed by Defendants

Will and Peavler, attesting to the accuracy of the 1Q 2015/16 10-Q.

### *February 9, 2016 Form 10-Q*

133.     On February 9, 2016, the Company filed a quarterly report on Form 10-Q with the

SEC for the fiscal quarter ended December 31, 2015 (the "2Q 2015/16 10-Q"), signed by

Defendants Will and Peavler, which failed to disclose: (1) the Accounting Misconduct; (2) that

Celadon's financial statements issued in years 2014, 2015, and 2016 contained knowing errors that

would necessitate restatements; and (3) that the Company failed to maintain internal controls.

134.    Instead, the 2Q 2015/16 10-Q stated, with regard to Celadon's internal controls:

**Item 4.        Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) that are designed to ensure that information required to be disclosed in our reports filed or submitted to the SEC under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that information is accumulated and communicated to management, including the principal executive and financial officers (referred to in this report as the "Certifying Officers"), as appropriate, to allow timely decisions regarding required disclosure based on the definition of "disclosure controls and procedures" in Rule 13a-15(b) under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply judgment in evaluating our controls and procedures.

We have carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report, as required by Rule 13a-15 and 15d-15 under the Exchange Act. This evaluation was carried out under the supervision and with the participation of our management, including the Certifying Officers. Based upon that evaluation, our Certifying Officers concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.

135.    Moreover, the 2Q 2015/16 10-Q stated, with regard to dealings with Element and

19th Capital, stating, in relevant part:

Since March of 2014, Quality has placed the majority of its tractors under management through a Program Agreement and Service Agreement with Element. In September 2015 we entered into a similar arrangement with 19th Capital (together with Element, the "Quality Financing Parties"). The 19th Capital arrangement differs from the Element arrangement in that we hold a minority equity interest in 19th Capital and, as a result, indirectly participate in the economics of 19th Capital's operations, whereas with Element we do not.

Pursuant to these agreements, we use our volume purchasing power to purchase tractors, which we then sell to the Quality Financing Parties.  Quality then refers

independent contractor drivers or fleets to the Quality Financing Parties, who lease tractors to such independent contractors or fleets or finance the drivers' purchase of tractors. Each Quality Financing Party has credit profile, customer concentration, and other business goals and restrictions, and may not grow, be able to obtain financing on acceptable terms, or even continue to finance tractors.

136.     Attached to the 2Q 2015/16 10-Q were SOX Certifications signed by Defendants Will and Peavler, attesting to the accuracy of the 2Q 2015/16 10-Q.

### *May 10, 2016 Form 10-Q*

137.     On May 10, 2016, the Company filed a quarterly report on Form 10-Q with the SEC for the fiscal quarter ended March 31, 2016 (the "3Q 2015/16 10-Q"), signed by Defendants Will and Peavler, which failed to disclose: (1) the Accounting Misconduct; (2) the investigation by the SEC into the Company's accounting practices; (3) that Celadon's financial statements issued in the years 2014, 2015, and 2016 contained knowing errors that would necessitate restatements; and (4) that the Company failed to maintain internal controls.

138.     Instead, the 3Q 2015/16 10-Q stated, with regard to Celadon's internal controls:

### Item 4.          Controls and Procedures

### Evaluation of Disclosure Controls and Procedures

We maintain disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) that are designed to ensure that information required to be disclosed in our reports filed or submitted to the SEC under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that information is accumulated and communicated to management, including the principal executive and financial officers (referred to in this report as the "Certifying Officers"), as appropriate, to allow timely decisions regarding required disclosure based on the definition of "disclosure controls and procedures" in Rule 13a-15(b) under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply judgment in evaluating our controls and procedures.

We have carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report, as required by Rule 13a-15 and 15d-15 under the Exchange Act. This evaluation was carried out under the supervision and with the participation of our management, including the Certifying Officers. Based upon that evaluation, our Certifying Officers concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.

139.    Moreover, the 3Q 2015/16 10-Q stated, with regard to dealings with 19th Capital,

stating, in relevant part:

In late September 2015, Quality Equipment Leasing, LLC and Quality Companies, LLC (together, "Quality" or "Quality Companies"), our wholly owned subsidiaries, entered into a Portfolio Purchase and Sale Agreement, a Fleet Program Agreement, a Service Agreement and a Program Agreement with 19th Capital Group, LLC ("19th Capital"). Under the Portfolio Purchase and Sale Agreement, 19th Capital purchased portfolios of Quality's independent contractor leases and associated assets. The net sales proceeds of units total $49.4 million for the nine months ended March 31, 2016. The net gain as a result of these transactions was $2.8 million. There were no sales in the three months ended March 31, 2016.

Under the Program Agreement, 19th Capital will finance the renewal and expansion of transportation assets operated by independent lessees. Under related agreements, Quality will provide administrative and servicing support for 19th Capital's lease and financing portfolio, certain driver recruiting, lease payment remittance, maintenance, and insurance services. The Company records such gains as deferred revenue in the liabilities section of the balance sheet and amortizes the deferred revenue over the expected life of the lease until 19th Capital disposes of the asset. The Company has deferred $3.5 million which is included in deferred leasing revenue on the condensed consolidated balance sheet as of March 31, 2016.

19th Capital was established with capital contributions from us (33.33%) and Tiger ELS, LLC ("Tiger") (66.67%), an entity controlled by Larsen MacColl Partners, an unaffiliated investment firm, in exchange for Class A Interests. As of March 31, 2016, we had invested $2.0 million of the total capital contributions.  In addition to the Company's ownership, certain members of Celadon's management own a membership interest in 19thCapital, issued in the form of Class B Interests, which begin to participate in equity value after 100% of the capital invested in 19th Capital, plus a preferred return of 12% per annum, has been returned to the holders of the Class A Interests. Celadon and Celadon's management, on a combined basis, have a minority interest in 19th Capital.

140.    Attached to the 3Q 2015/16 10-Q were SOX Certifications signed by Defendants

Will and Peavler, attesting to the accuracy of the 3Q 2015/16 10-Q.

### *September 13, 2016 Form 10-K*

141.    On September 13, 2016, the Company filed a quarterly report on Form 10-Q with the SEC for the fiscal quarter ended June 30, 2016 (the "2015/16 10-K"), signed by Defendants Will, Peavler, Miller, Long, Langham, and Buck, which failed to disclose: (1) the Accounting Misconduct; (2) the investigation by the SEC into the Company's accounting practices; (3) that Celadon's financial statements issued in the years 2014, 2015, and 2016 contained knowing errors that would necessitate restatements; and (4) that the Company failed to maintain internal controls.

142.    Instead, the 2015/16 10-K stated, with regard to Celadon's internal controls:

### Item 9A.        Controls and Procedures

**EVALUATION OF DISCLOSURE CONTROLS AND PROCEDURES**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted to the SEC under the Securities Exchange Act of 1934, as amended (the Exchange Act), is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that information is accumulated and communicated to management, including the principal executive and financial officers (referred to in this report as the Certifying Officers), as appropriate, to allow timely decisions regarding required disclosure based on the definition of "disclosure controls and procedures" in Rule 13a-15(b) under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply judgment in evaluating our controls and procedures.

Based upon that Evaluation, our Certifying Officers have concluded that, as of June 30, 2016, the Company's disclosure controls and procedures are effective.

143.    Moreover, the 2015/16 10-K stated, with regard to dealings with Element:

We routinely enter into leases with independent contractors which we classify and record as operating leases.  From time to time we will assign these leases and sell the underlying assets to third party financing companies. Total net proceeds and net gain as a result of these transactions during the year ended June 30, 2016 was

$328.6 million and $22.4 million, respectively, compared to $329.0 million and $21.5 million during the year ended June 30, 2015. Total net proceeds and net gains are inclusive of the amounts recorded from 19th Capital as mentioned in note 17. The majority of the net proceeds and net gains are from the equipment we routinely sell to Element Financial Corp. ("Element") under our agreement with Element for use by independent contractors. The $8.2 million of net operating income reported under the equipment leasing and services segment for the year ended June 30, 2016 includes $22.4 million in gains recorded on a net basis for such period, less operating expenses associated with this segment.

* * *

We have recorded in our assets on our consolidated balance sheet an amount that represents advances made to Element relating to our Lease Shortfall Advance arrangement. These advances are for shortfalls between the required lease payments and the amount actually collected from the independent contractor or fleet.  Element is required to reimburse us for Lease Shortfall Advance payments and, accordingly, we have accounted for the related receivable under other assets on our consolidated balance sheet, in the amount of $31.9 million as of June 30, 2016.

We entered into a Letter Agreement Regarding Additional Reserve Account Contributions on December 29, 2015 with Element which makes us responsible for an additional $2.5 million of reserve funds to the extent that we are unable to recoup this amount from the reseating of trucks and sale proceeds for trucks pursuant to our agreements with Element.  We have evaluated this contingency under ASC 450 – Contingencies and determined that it is not probable that we will incur this amount at this time and therefore have not reserved this amount.

144.    The 2015/16 10-K additionally commented on the Company's dealings with 19th

Capital, stating, in relevant part:

In the first quarter of fiscal 2016, we acquired a minority interest in 19th Capital, a newly formed used equipment leasing company and reseller.  We account for our investment in 19th Capital using the equity method of accounting.  19th Capital faces several risks similar to those we face and additional risks particular to its business and operations.  The ability to secure financing and market fluctuations in interest rates could impact 19thCapital's ability to grow its leasing and financing business and its margins on leases and financing. Adverse economic activity may restrict the number of used equipment buyers, their ability to pay acceptable prices for used equipment, and create financing defaults, bankruptcies, and difficulties recovering equipment. In addition, 19th Capital's customers are typically small trucking companies or independent contractors without substantial financial

resources, and 19th Capital is subject to risk of loss should those customers be unable to make their lease payments.

If a lessee or other counterparty fails to maintain the equipment in accordance with the terms of the financing agreements, 19th Capital may have unanticipated repair expenditures. As regulations change, the market for used equipment may be impacted as such regulatory changes may make used equipment costly to upgrade to comply with such regulations or 19th Capital may be forced to scrap equipment if such regulations eliminate the market for particular used equipment. Further, there is an overlap in providers of equipment financing to 19th Capital and our wholly owned operations and those providers may consider the combined exposure and limit the amount of credit available to us. Any of the foregoing risks could materially and adversely impact the value of and our return on our investment in 19th Capital, which could negatively impact our financial condition, results of operations, and cash flow.

In addition, while certain of our executive officers serve as two of the managers of 19th Capital, we do not control 19th Capital's ownership or management. Our investment in 19th Capital is subject to the risk that 19th Capital's management and controlling members may make business, financial, or management decisions with which we do not agree or that the management or controlling members may take risks or otherwise act in a manner that does not serve our interests. If any of the foregoing were to occur, the value of our investment in 19th Capital could decrease, and our financial condition, results of operations, and cash flow could suffer as a result.

Finally, we expect that, for federal income tax purposes, 19th Capital will be treated as the owner and lessor of the equipment that it leases to third parties. However, the IRS could instead assert that such leases are sales or financings. If it were determined that 19th Capital is not the owner of the leased equipment, 19th Capital would not be entitled to cost recovery, depreciation or amortization deductions, and its leasing income might be deemed to be portfolio income instead of passive activity income. The denial of such cost recovery or amortization deductions could cause its tax liabilities to increase, and therefore the amount of cash available for distribution to us to decrease, in certain periods.

* * *

**19th Capital's grant of profits interests to certain of our officers and employees may cause conflicts of interest.**

As part of our formation and minority investment in 19th Capital, certain of our officers and employees were granted profits interests in 19thCapital. These individuals' economic interests as holders of 19th Capital's profits interests may

not always align with the interests of our stockholders. In particular, the profits interests may create economic incentives to devote time, energy, and resources to 19th Capital that may not necessarily benefit us or our stockholders to the same extent as efforts devoted directly to us, or at all. These conflicts of interest, or even the perception that they exist, may have an adverse effect on the trading price of our common stock. If the joint venture contemplated by the MOU is consummated, these profits interests are expected to be eliminated, although the terms of any such elimination have not been negotiated.

145.    Attached to the 2015/16 10-K were SOX Certifications signed by Defendants Will and Peavler, attesting to the accuracy of the 2015/16 10-K.

### October 28, 2016 Proxy Statement

146.    On October 28, 2016, the Company filed the 2016 Proxy Statement, which failed to disclose: (1) the Accounting Misconduct; (2) the investigation by the SEC into the Company's accounting practices; (3) that Celadon's financial statements issued in the years 2014, 2015, and 2016 contained knowing errors that would necessitate restatements; and (4) that the Company failed to maintain internal controls.

147.    Moreover, due to the Individual Defendants' violations of the Code of Conduct, the 2016 Proxy Statement was false and misleading in representing that Celadon adopted the Code of Conduct, and that it applied to Celadon's officers, directors, and employees.

### November 9, 2016 Form 10-Q

148.    On November 9, 2016, the Company filed a quarterly report on Form 10-Q with the SEC for the fiscal quarter ended September 30, 2016 (the "1Q 2016/17 10-Q"), signed by Defendants Will and Peavler, which failed to disclose: (1) the Accounting Misconduct; (2) the investigation by the SEC into the Company's accounting practices; (3) that Celadon's financial statements issued in the years 2014, 2015, and 2016 contained knowing errors that would necessitate restatements; and (4) that the Company failed to maintain internal controls.

149.   Instead, the 1Q 2016/17 10-Q stated, with regard to Celadon's internal controls:

**Item 4.          Controls and Procedures**

We maintain disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted to the SEC under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that information is accumulated and communicated to management, including the principal executive and financial officers (referred to in this report as the "Certifying Officers"), as appropriate, to allow timely decisions regarding required disclosure based on the definition of "disclosure controls and procedures" in Rule 13a-15(b) under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply judgment in evaluating our controls and procedures.

We have carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report, as required by Rule 13a-15 and 15d-15 under the Exchange Act. This evaluation was carried out under the supervision and with the participation of our management, including the Certifying Officers. Based upon that evaluation, our Certifying Officers concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.

150.   The 1Q 2016/17 10-Q additionally commented on the Company's dealings with

19th Capital, stating, in relevant part:

19th Capital Group, LLC ("19th Capital") was established with capital contributions from us (33.33%) and Tiger ELS, LLC ("Tiger") (66.67%), an entity controlled by Larsen MacColl Partners, an unaffiliated investment firm, in exchange for Class A Interests. We account for our investment in 19th Capital under the equity method of accounting.  For the three months ended September 30, 2016, we had recorded $0.1 million of investment income.  In addition to the Company's ownership, certain members of Celadon's management own a membership interest in 19th Capital, in the form of Class B Interests, which begin to participate in equity value after 100% of the capital invested in 19th Capital, plus a preferred return of 12% per annum, has been returned to the holders of the Class A Interests. Celadon and Celadon's management, on a combined basis, have a minority interest in 19th Capital.

In September 2015, our Quality Companies subsidiaries ("Quality" or "Quality Companies") entered into a Portfolio Purchase and Sale Agreement, a Fleet

Program Agreement, a Service Agreement, and a Program Agreement with 19th Capital. Under the Portfolio Purchase and Sale Agreement, 19th Capital purchased portfolios of Quality's independent contractor leases and associated assets. No sales have occurred during the three months ended September 30, 2016.

Under the Program Agreement, 19th Capital will finance the renewal and expansion of transportation assets operated by independent lessees. Under related agreements, Quality will provide administrative and servicing support for 19th Capital's lease and financing portfolio, certain driver recruiting, lease payment remittance, maintenance, and insurance services. The Company records deferred leasing revenue related to its servicing of the lease payments and driver recruiting services in the liabilities section of the balance sheet and amortizes the deferred leasing revenue over the expected life of the lease or until 19th Capital disposes of the asset. The Company has $0.6 million of deferred leasing revenue related to these transactions on the consolidated balance sheet as of September 30, 2016. The Company has a receivable from 19th Capital of $2.0 million for the servicing of 19th Capital owned assets under lease. Additionally, we have collected $1.3 million of lease payments as of September 30, 2016 that we owe to 19th Capital and are recorded on our consolidated balance sheet as an accrual.

151.    The 1Q 2016/17 10-Q also discussed the closing of the joint venture with Element

and related Memorandum of Understanding, stating, in relevant part:

In September 2016, we signed a Memorandum of Understanding (the "MOU") with Quality's main third party financing provider, under which substantially all of Quality's tractors under management owned by such third party financing provider, 19th Capital, and Quality would be combined into 19th Capital as a joint venture. Upon closing of the joint venture, the existing agreements with the third party financing provider would be terminated and replaced with definitive agreements contemplated by the MOU. Under the MOU, the next steps involving our fleet would include (1) the purchase of approximately $50.0 million of equipment by the joint venture, with financing to the joint venture being provided by the third party financing source, and (2) our contribution will include approximately $70 million of additional equipment to the joint venture. Our goal is to complete the joint venture during the December quarter of fiscal 2017. Upon completion we believe substantially all assets under lease or available to be leased will have been contributed or sold to the joint venture. Although we believe the transactions are on schedule for this timeframe, they remain subject to various consents, definitive documentation, and other risks associated with changes in terms or failure to reach agreement.

152.    Attached to the 1Q 2016/17 10-Q were SOX Certifications signed by Defendants

Will and Peavler, attesting to the accuracy of the 1Q 2016/17 10-Q.

***December 30, 2016 Press Release***

153.     On December 30, 2016, the Company issued a press release, titled "Celadon Group

Announces Closing of Joint Venture with Element Fleet Management."  The press release failed

to disclose: (1) the Accounting Misconduct; (2) the investigation by the SEC into the Company's

accounting practices; (3) that Celadon's financial statements issued in the years 2014, 2015, and

2016 contained knowing errors that would necessitate restatements; and (4) that the Company

failed to maintain internal controls.

154.     In the press release, Celadon touted the Company's $100 million investment in its

joint venture with Element, stating, in relevant part:

> INDIANAPOLIS, Dec. 30, 2016 /PRNewswire/ -- Celadon Group, Inc. (NYSE:
> CGI) ("Celadon") announced today that it has entered into a joint venture
> agreement with Element Transportation LLC ("Element"), a subsidiary of Element
> Fleet Management (TSX: EFN). The joint venture will hold leasing assets managed
> by Celadon's Quality Companies, LLC business unit ("Quality") and formerly held
> by a combination of Celadon (including, Element, and 19th Capital Group, LLC
> ("19th Capital"), a Delaware limited liability company.
>
> * * *
>
> Chairman and Chief Executive Officer Paul Will commented:  "We are very
> pleased to announce the closing of our previously announced joint venture
> transaction with Element.  Since August, we have been working diligently with the
> Element team to structure a high quality, well-capitalized business that will provide
> excellent transportation assets and high quality service to our customers.  With the
> interests and investments of Element and Celadon strongly aligned, an experienced
> management team, and the resources to optimize leasing assets, the joint venture
> has the components for success.  The support and business acumen of the Element
> team were instrumental to the process, and we appreciate their partnership."
>
> "In addition to capitalizing a strong joint venture, the transactions furthered
> Celadon's goals of exiting the capital intensive component of the leasing business,
> reducing balance sheet debt, and converting our Quality Companies unit primarily
> to an asset light business.   We believe the transaction has multiple benefits for our
> stockholders and are excited to be able to focus our resources on the trucking side
> of the business."

"We have built a long-term relationship with Celadon, and we are excited to deepen our partnership," stated Bradley Nullmeyer, Chief Executive Officer of Element. "This joint venture expands Element's position in the Class 8 tractor sector and provides a great opportunity to broaden our range of fleet services across a larger market, with a great partner."

155.     The press release provided additional information on the joint venture, stating, in

relevant part:

The joint venture represents the combination of the former equipment leasing portfolios of Celadon, Element, and 19th Capital that were managed by Quality. The joint venture holds over 10,000 tractors for use in leasing operations, with a business plan focused on leasing to trucking fleets.  The joint venture is considered to be one of the leading lessors to this market, with an augmented and experienced management team that is focused on driving excellence throughout the business.

The joint venture was formed through recapitalizing 19th Capital. The former owners of 19th Capital (including Celadon's former Class A and Class B interests) were redeemed using pre-transaction cash of 19th Capital, and new equity was contributed by Celadon and Element to establish the post-transaction capitalization. Celadon's contribution includes cash and lease equipment totaling $100 million in value in exchange for its equity in the joint venture. The cash component was more than offset by proceeds of redemption, settlement of the deferred purchase price on assets sold to 19th Capital in FY2016, and collection of an amount relating to the terminated pre-joint venture arrangements. After the contributions, each of Celadon and Element own approximately 49.99% of the joint venture's equity, with employees of 19th Capital holding the remainder.

As part of the transaction, all previous agreements between Celadon, Element, 19th Capital, and their respective affiliates, have been terminated or assumed by the joint venture with no liability of Celadon. Quality has entered into a new Service Agreement with the joint venture and will provide leasing management services in exchange for a monthly fee per tractor.

156.     The press release moreover discussed cash proceeds the Company received from

the sale of equipment associated with the Quality Companies business, stating, in relevant part:

In addition to closing the joint venture, Celadon received approximately $50 million in cash proceeds from the sale of equipment associated with the Quality business at net book value for use by the joint venture.  This sale and the equity contribution of equipment substantially reduced the Company's equipment held for sale, leased assets held for sale, and leased assets.

- 53 -

The Company will file a Form 8-K containing additional information within the required timeframe.

### *January 6, 2017 Form 8-K*

157.     On January 6, 2017, Celadon filed a Form 8-K with the SEC providing further information on the Company's joint venture with Element, including, *inter alia*, a contribution of a $31.8 million case reimbursement of lease shortfall advances by the Company.  The Form 8-K failed to disclose: (1) the Accounting Misconduct; (2) the investigation by the SEC into the Company's accounting practices; (3) that Celadon's financial statements issued in the years 2014, 2015, 2016, and 2017 contained knowing errors that would necessitate restatements; and (4) that the Company failed to maintain internal controls.

158.     The Form 8-K stated, in relevant part:

- The Company (i) contributed $35.3 million in cash to 19th Capital, (ii) conveyed to 19th Capital equipment (primarily tractors) categorized as equipment held for sale, leasing assets held for sale, or leasing assets used with a net book value of $63.6 million, and (iii) received credit for $1.1 million of unencumbered cash in the bank accounts of 19th Capital immediately at the consummation of the Transaction.  In consideration of the foregoing, 19th Capital (i) issued to the Company membership units of 19th Capital, which, after the consummation of the Transactions, constituted approximately 49.99% of the issued and outstanding units of $19^{th}$Capital, (ii) paid to the Company $31.8 million in cash for reimbursement of previous payments made by the Company related to the Element assets, and (iii) issued the Company an obligation to distribute restricted cash of 19th Capital and its subsidiaries at the closing of the Transactions of approximately $2.5 million at such time as such cash becomes unrestricted. Going forward, the Company has agreed not to enter into additional leases as lessor in the equipment leasing business, subject to a modest exception for short-term leasing pending ordinary course dispositions from the Company's trucking fleet.

159.     The Form 8-K additionally provided a "Summary of Cash Sources and Uses" and a "Summary of Equipment Transactions," stating, in relevant part:

## Summary of Cash Sources and Uses

The following table summarizes the Company's primary sources and uses of cash associated with the Transactions (excluding taxes, fees, and expenses):

| Source / (Use) (in millions) | Description |
|---|---|
| $    4,600 | Cash received – redemption |
| 6,700 | Cash received – receipt of deferred purchase price cash |
| 50,000 | Cash received – sale of Quality equipment |
| 31,800 | Cash received – reimbursement of Other Assets |
| (35,300) | Cash invested in 19th Capital at closing |
| $   57,800 | Net cash received at closing |

The foregoing excludes other sources and uses of cash during the quarter and should not be considered a substitute for the Company's net changes in cash during the quarter.

## Summary of Equipment Transactions

The following table summarizes the Company's total contribution to 19th Capital at closing, including equipment dispositions associated with the Transactions:

| Source / (Use) (in millions) | Description |
|---|---|
| $   56,000 | Equipment contributed to 19th Capital at closing |
| 21,900 | Contribution of deferred sale assets from 9/30/2016 |
| 50,000 | Equipment sold to Element at closing |
| 34,600 | Settlement of deferred sale assets from 6/30/2016 |
| $  162,500 | Total equipment reduction at closing |

| $ | 14,300 | Contribution of deferred sale liability from 9/30/2016 |
|---|---|---|
| | 26,000 | Settlement of deferred sale liability from 6/30/2016 |
| $ | 40,300 | Total reduction in liabilities at closing |

| $ | 77,900 | Equipment contributed to 19th Capital at closing |
|---|---|---|
| | (14,300) | Other liabilities related to contributed deferred sales assets |
| | 35,300 | Cash contributed to 19th Capital |
| | 1,100 | Undistributed cash remaining with 19thCapital |
| $ | 100,000 | Total contribution to 19th Capital at closing |

***February 10, 2017 Form 10-Q***

160.    On February 10, 2017, the Company filed a quarterly report on Form 10-Q with the SEC for the fiscal quarter ended December 31, 2016 (the "2Q 2016/17 10-Q"), signed by Defendants Will and Peavler, which failed to disclose: (1) the Accounting Misconduct; (2) the investigation by the SEC into the Company's accounting practices; (3) that Celadon's financial statements issued in the years 2014, 2015, 2016, and 2017 contained knowing errors that would necessitate restatements; and (4) that the Company failed to maintain internal controls.

161.    The 2Q 2016/17 10-Q noted, *inter alia*, the Company's collection of $31.8 million in lease shortfall advances from Element and the contribution of that total to the Company's joint venture with Element, stating, in relevant part:

> In December 2016, the Company, Quality Companies LLC, a wholly-owned subsidiary of the Company ("Quality"), Quality Equipment Leasing, LLC, a wholly-owned subsidiary of the Company ("Leasing"), 19th Capital Group, LLC, a non-controlling investment of the Company before and after the transactions described below ("19th Capital"), Element Transportation LLC ("Element"), and certain other parties entered into a series of simultaneous agreements and related transactions (collectively, the "Transactions"), pursuant to which substantially all

tractors under management by Quality and owned by Element, 19th Capital, Quality, and Leasing have been combined into 19th Capital as a joint venture primarily between the Company and Element. After the Transactions, the Company and Element each own a non-controlling approximately 49.99% interest in 19th Capital, which at December 31, 2016, held the rights to over 10,000 tractors for use in leasing operations. The Company recorded $100.0 million as a minority investment and will record operating results of the joint venture using the equity method of accounting. The Transactions included the following:

- *Redemption of Existing Members*: 19th Capital redeemed all of its issued and outstanding membership interests, including those owned by the Company, for $15.7 million in cash. The Company's proceeds from the redemption were approximately $4.6 million in cash. The proceeds received relate primarily to the original $2.0 million that had been invested by the Company in 2015 and its proportionate share of undistributed earnings from inception. The Company recorded a net gain on the redemption of approximately $0.3 million, reflecting the excess of redemption proceeds over the initial investment plus equity income profits previously recognized. In addition to the redemption amount, the Company is entitled to receive approximately $2.5 million in restricted cash when the restrictions lapse. The Company has evaluated this receivable under ASC 450 – Contingencies and has not recorded a receivable within our financial statements at this time. If and when collected, this amount would be recorded as income.

- *Deferred Sale with 19th Capital*: As part of the Transactions the Company received proceeds of $6.7 million in payment of deferred purchase price from a sale of equipment to 19th Capital in the June 30, 2016 quarter. This collection triggered sales accounting treatment for leased assets where recognition of the sale was deferred and leased assets remained on the Company's balance sheet. As a result, the Company removed $34.6 million of "Leased assets" and $26.0 million of liabilities recorded within "Lease servicing liabilities" and "Other long term liabilities". The Company did not recognize any gain or loss with this transaction.

- *Sale to Element*: The Company sold tractors and trailers and assigned the related leases to Element for approximately $50.0 million. There was no material gain or loss on the disposition of this equipment.

- *Receipt of Lease Servicing Advance ("Perfect Pay")*: The Company received $31.8 million in cash related to a receivable from Element related to the Company's Perfect Pay obligations under the prior service agreements with Element.

- *Contribution by the Company*:  The Company (i) contributed $35.3 million in cash to 19th Capital, (ii) conveyed to 19th Capital equipment (primarily tractors) categorized as equipment held for sale, leasing assets held for sale, or leasing assets used, with a net book value of $56.0 million, (iii) received credit for $1.1 million of amounts owed to the Company by 19th Capital and (iv) contributed $7.6 million of the remaining consideration due from 19th Capital related to a September 30, 2016 deferred sale transaction with 19th Capital that was previously recorded as a financing transaction under GAAP.  The contribution of the $7.6 million resulted in the removal of "Leased assets" of $21.9 million and $14.3 million of liabilities recorded within "Lease servicing liabilities" and "Other long term liabilities".  In consideration of the foregoing, 19th Capital (i) issued to the Company membership units of 19th Capital, which, after the consummation of the Transactions, constituted approximately 49.99% of the issued and outstanding units of 19th Capital.

162.  The 2Q 2016/17 10-Q also provided the following summary of the above transactions:

- *Summary of Transactions*:  The following table summarizes the Company's total contribution to 19th Capital at closing (in thousands):

| Contribution | Description |
|---|---|
| $56,000 | Equipment contributed to 19th Capital at closing |
| 7,600 | Contribution of deferred sale receivable |
| 35,300 | Cash contributed to 19th Capital |
| 1,100 | Receivable due from 19th Capital |
| $100,000 | Total contribution to 19th Capital at closing |

163.  The 2Q 2016/17 10-Q moreover discussed the Company's cash flows for the covered fiscal quarter, stating, in relevant part:

Net cash provided by operations for the six months ended December 31, 2016 was $58.5 million, compared to $22.9 million for the six months ended December 31, 2015. The increase reflected several items related to the closing of our joint venture in December 2016 and related equipment transactions during the period.  These items include, $31.8 million in collection of cash payment recorded under other assets, distributions received on earnings from an unconsolidated entity of $2.6 million, and a $16.9 million reduction in leased revenue equipment held for sale.  Excluding these amounts, net cash flow provided by operations was $7.2 million for the six months ended December 31, 2016. Leased revenue equipment

held for sale reflects $82.1 million of sales less $65.2 million of purchases for the six months ended December 31, 2016. These purchases relate solely to equipment for the benefit of our equipment leasing and services segment which activities will be undertaken through 19th Capital moving forward. Leased revenue equipment held for sale was zero at December 31, 2016. Purchases and sales of used Celadon fleet equipment are included within our net cash provided by investing activities.

164.    The 2Q 2016/17 10-Q also commented on the Company's internal controls, stating,

in relevant part:

### Item 4.        Controls and Procedures

**Evaluation of Disclosure Controls and Procedures**

We maintain disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) that are designed to ensure that information required to be disclosed in our reports filed or submitted to the SEC under the Exchange Act, is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms, and that information is accumulated and communicated to management, including the principal executive and financial officers (referred to in this report as the "Certifying Officers"), as appropriate, to allow timely decisions regarding required disclosure based on the definition of "disclosure controls and procedures" in Rule 13a-15(b) under the Exchange Act. In designing and evaluating the disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply judgment in evaluating our controls and procedures.

We have carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report, as required by Rule 13a-15 and 15d-15 under the Exchange Act. This evaluation was carried out under the supervision and with the participation of our management, including the Certifying Officers. Based upon that evaluation, our Certifying Officers concluded that our disclosure controls and procedures were effective as of the end of the period covered by this report.

165.    Attached to the 2Q 2016/17 10-Q were SOX Certifications signed by Defendants

Will and Peavler, attesting to the accuracy of the 1Q 2016/17 10-Q.

**The Truth Begins to Emerge**

***April 5, 2017 Prescience Report***

166.    On April 5, 2017, *Seeking Alpha* published a report prepared by Prescience which alleged, *inter alia*, that Celadon overstated its investment in its joint venture with Element by $31.8 million.  The report, titled "Celadon Group: A Story That Ends At Chapter 11," stated, in relevant part:

**CGI Lied RE Collecting on its $31.8m Shortfall Receivable. Is this the Smoking Gun that it's Falsifying its Financials?**

Given that the Lease Shortfall Advances were a significant reason that cash flow had turned negative, investors were obviously concerned about these payments. CGI had highlighted that its JV arrangement would not require continued Lease Shortfall Advances.3 8-K from 01/06/2017: "The new Service Agreement does not contain any payment remitting, "Perfect Pay" or similar obligation"

Furthermore, CGI prominently highlighted in its Q2'17 earnings release filed on 2/01/2017 that it collected $31.8m of prior Lease Shortfall Advances from Element. Unfortunately, based on information provided in the JV subscription agreement, it appears that **CGI never actually collected its Lease Shortfall Advances. CGI received a sham daylight loan from the JV:** In the subscription agreement, CGI disclosed that Element provided a "daylight loan" of $31.8m to the JV, the JV then gave the $31.8m to CGI, and then CGI paid the $31.8m back to the JV to pay off the outstanding contribution from Element. What essentially happened is Element gave CGI $31.8m and then CGI handed that $31.8m right back to Element (with the JV as an intermediary). The circular transaction created the illusion that CGI collected it Lease Shortfall Advances and made a $31.8m contribution to the JV, but this is just accounting gimmicks. No value was ever created or contributed to the JV.



The specific details of the Lease Shortfall Advance and related daylight loans are detailed below.

**Element required to repay the Lease Shortfall Advances:** CGI was obligated to provide lease shortfall payments to Element on an ongoing basis. By the end of Q1'17, CGI had made $31.9m in payments to Element. These payments were

capitalized (i.e. not expensed) on CGI balance sheet as "Lease Shortfall Advances" within Other Assets. In its Q1'17 10-Q, CGI noted that Element was obligated to reimburse it for these payments:

> "The financing provider is required to reimburse us for these advances and, accordingly, **we have accounted for the related receivable under other assets** on our consolidated balance sheet, in the amount of **$31.9 million** as of September 30, 2016, and June 30, 2016."

167.    The report continued:

**CGI claims it collected its Lease Shortfall Advances from Element:** In its 8-K filed on 1/6/2017, CGI claimed its $31.9m lease shortfall receivable had been almost completely reimbursed by Element as part of the JV closing:

**Net Cash Received from the JV Closing**

| ($ millions) | Q2' 17 |
|---|---|
| Cash received – redemption | $4.6 |
| Cash received – receipt of deferred purchase price cash | $6.7 |
| Cash received – sale of Quality equipment | $50.0 |
| Cash received – reimbursement of Other Assets | $31.8 |
| Cash invested in JV at closing | ($35.3) |
| **Net cash received at closing** | **$57.8** |

Sources: CGI filings with the SEC

**As disclosed in the subscription agreement, Element loaned money to CGI:** We believe the JV subscription agreement indicates that no collection occurred.

Specifically, the subscription agreement details that Element provides a $31.8m "daylight loan" to the JV (i.e. "the Company" below), and then the JV would give the $31.8m received from Element to CGI.

> *At the closing of the Element Investment,*
>
> *((i)) Element shall transfer, convey, and assign to the Company the Element Assets;*

*(ii) Element shall make a loan to the Company in the principal amount of*

*$31,800,000 (the "Element daylight loan"), which shall be evidenced by*

*this Agreement, and the Company shall pay $31,800,000 to Celadon in*

*respect of the Payment; (Subscription Agreement, 02/10/17)*

**As also disclosed in the subscription agreement, CGI immediately paid back the loan to Element:** The subscription agreement further details that (1) CGI will transfer the cash to the JV (i.e. "the Company" below) and the JV would repay the loan from Element. Thus, CGI gave the cash it received from the daylight loan right back to Element at the JV closing. This, in our opinion, proves without a shadow of a doubt that CGI created a gimmick loan to fool investors into believing that it collected its outstanding Lease Shortfall Advances.

*At the closing of the Celadon Investment,*

*((i)) Celadon shall transfer, sell, and assign all of its interests in the Quality*

*Assets to the Company;*

*(ii) Celadon shall transfer $31,800,000 in cash to an account designated by*

*the Company, and the Company shall repay the Element Daylight Loan in*

*full; (Subscription Agreement, 02/10/17)*

### *April 19, 2017 Second Prescience Report*

168.    On April 19, 2017, a second Prescience Report was published, titled "FOIA Requests Reveal CGI as the Subject of an Active SEC Investigation," disclosing that Prescience was denied information about Celadon sought under the FOIA because of an ongoing SEC investigation.  The report stated, in relevant part:

### <u>CGI is Being Investigated by the SEC Enforcement Division</u>

We received data in response to our Freedom of Information Act ("FOIA") requests that confirms CGI is the subject of an active SEC investigation. CGI has <u>failed to disclose</u> these proceedings.

In a letter dated March 3, 2017, the FOIA office denied our request for access to CGI's investigative records by invoking Exemption (b)(7)(A) of the FOIA. Citation of the (b)(7)(A) exemption means that the SEC deems the release of information it has collected on CGI could be expected to interfere with law enforcement proceedings.

- An excerpt from the first page of the FOIA office's response letter is provided below:



- Again, by invoking Exemption (b)(7)(A), the SEC has acknowledged that CGI is the subject of an ongoing SEC investigation. Per the <u>Department of Justice,</u>

    *The first subpart of Exemption 7 of the Freedom of Information Act, Exemption 7, authorizes the withholding of 'records or information compiled for law enforcement purposes, but <u>only to the extent that</u>*

*production of such law enforcement records or information . . . could*
*reasonably be expected to interfere with enforcement proceedings.'*

169.    The report also noted further confirmation regarding the existence of an

investigation obtained by Prescience, stating, in relevant part:

- For further confirmation of the existence of an investigation, we sent an administrative appeal to the General Counsel's office. In its response, the General Counsel's office denied our access to CGI's records by once again invoking Exemption (b)(7)(A), stating that releasing investigative records on CGI could "interfere with ongoing enforcement proceedings." By doing so, the General Counsel's office has confirmed that CGI is the subject of an active SEC investigation. An excerpt from the first page of the General Counsel's response letter is provided below:



170.    The report further noted that future enforcement actions against the Company "are

likely inevitable," stating, in relevant part:

> **Overwhelming Evidence of Wrongdoing Means that Future Enforcement Actions Are Likely Inevitable**
>
> Based on our analysis, CGI has left a paper trail of wrongdoing: Its most recent SEC filings contain an overwhelming amount of evidence that indicates it grossly fabricated its financial reports. For example, as detailed in our Initiation Report, the JV subscription agreement filed on February 10th contains what, in our view, amounts to incontrovertible proof that CGI lied about collecting a $31.8m receivable from Element. Given how thorough its investigations generally are, we believe the SEC is almost certain to take notice of such seemingly definitive evidence of misconduct during its review of CGI's filings. Therefore, we fully expect the SEC's investigation to result in severe enforcements actions against the company and its senior management team.

171.   The report also provided the following summary of Prescience's findings regarding the $31.8 million the Company received from Element prior to the closing of their joint venture:

> A quick recap of our findings about the $31.8m receivable is provided below:
>
> - CGI claimed in its January 6th 8-K and Q2'17 10-Q that it collected on a $31.8m receivable from Element prior to the JV closing.
> - The truth, as later disclosed in the JV subscription agreement, is that CGI received a $31.8m sham 'daylight loan' from Element which was then immediately paid off at the JV closing. Thus, it appears CGI was not reimbursed by Element and should have written off this receivable in its Q2'17 financial statements; in not doing so, CGI inflated its asset values.
> - This, in our view, amounts to incontrovertible proof that CGI inflated its Q2'17 TBV and profits by at least $31.8m.

***May 1, 2017 Form 8-K***

172.   On May 1, 2017, the Company filed a Form 8-K with the SEC stating, *inter alia*, that BKD had notified the chair of the Audit Committee on April 25, 2017 that it was withdrawing its reports on the financial statements of the Company for the periods ended on June 30, 2016, September 30, 2016, and December 31, 2016, and that those reports should no longer be relied upon.  The Form 8-K stated, in relevant part:

**Item 4.02      Non-Reliance on Previously Issued Statements or a Related Audit Report or Completed Interim Review.**

(a) and (b)  On April 25, 2017, BKD, LLP ("BKD"), the independent auditors for the Company, informed the chair of the Audit Committee of the Company's Board of Directors (the "Audit Committee") that it was withdrawing its reports on the June 30, 2016, September 30, 2016, and December 31, 2016 financial statements of the Company, and that those reports should no longer be relied upon.  BKD advised the Company that additional information relating to transactions involving revenue equipment held for sale had come to BKD's attention subsequent to BKD's issuance of its audit report on the Company's June 30, 2016 financial statements and after the issuance of BKD's review reports on the Company's September 30, 2016 and December 31, 2016 interim financial statements.  BKD further advised the Company that, in accordance with PCAOB Auditing Standard 2905, BKD had performed procedures to evaluate this information, including requesting explanations and supporting documentation from the Company's management.  Based on the results of BKD's procedures, BKD advised the Company that BKD has been unable to obtain sufficient appropriate audit evidence to provide a reasonable basis to support its previously issued reports for the periods indicated above.  As a result, as of May 1, 2017, the Audit Committee has concluded that the Company's financial statements for the fiscal year ended June 30, 2016 and quarters ended September 30 and December 31, 2016, and related reports of BKD, should not be relied upon.

The Audit Committee has discussed with BKD the matters disclosed under this Item 4.02. Based on these discussions, the Company understands the following:  (i) BKD has not resigned as the Company's auditor; (ii) BKD has determined that it has not obtained sufficient appropriate audit evidence with respect to the revenue equipment held for sale transactions to determine that those transactions were properly recorded in accordance with GAAP; and (iii) BKD is prepared to review additional information, if any, and adjustments to the Company's financial statements, if any, and to then consider whether to re-issue the withdrawn reports.

The insufficient appropriate audit evidence relates to the accounting (and related structure, substance, and disclosure) of transactions involving dispositions and acquisitions of revenue equipment between June and December of 2016 and the related carrying values.  Additional information concerning the transactions and the fair values of the revenue equipment disposed of and acquired is required to determine the appropriateness of the accounting for these transactions.   The need for additional information followed an Audit Committee request of BKD to perform additional procedures on the transactions prior to the normal audit cycle for fiscal 2017.

*April 2, 2018 Press Release*

173.    On April 2, 2018, the Company issued a press release, titled "Celadon Group to Restate Prior Financial Statements; Announces Credit Agreement Amendment and Operations Update."  In the press release the Company stated that its financial statements for fiscal years 2016 and the quarters ended September 30, 2016 and December 31, 2016 and related reports of BKD should no longer be relied upon.  The press release, *inter alia*, also noted that an internal investigation and management review identified errors that will require adjustments to the Company's previously issued 2014, 2015, 2016, and 2017 financial statements, and potentially periods prior thereto.

174.    The press release stated, in relevant part:

**Audit Committee Investigation and Related Matters**

On May 1, 2017, Celadon announced that the Company's financial statements for fiscal year 2016 (ended June 30, 2016) and the quarters ended September 30, 2016 and December 31, 2016 and related reports of the Company's independent registered public accounting firm, BKD, LLP ("BKD") should no longer be relied upon. The Audit Committee of Celadon's Board of Directors immediately commenced an investigation with the assistance of an independent law firm and a leading international auditing, tax, and advisory firm (the "internal investigation"). The internal investigation is nearing completion but remains ongoing.

Celadon's new senior management team, led by the Company's new Chief Financial Officer and new Chief Accounting Officer, also subsequently commenced a review of the Company's current and historical accounting policies and procedures.  The internal investigation and management review have identified errors that will require adjustments to the previously issued 2014, 2015, 2016, and 2017 financial statements (and potentially periods prior thereto).  The amounts, periods, and adjustments described below are preliminary, have not been subjected to any audit procedures, and are subject to change.  The estimated range of amounts and periods described below are being provided to indicate a general sense of the magnitude of the expected changes and should not be considered definitive.  Based upon its analysis and assessment of presently available information, the Company presently expects the adjustments to include the following:

- 67 -

- Equipment Held for Sale Transactions. The internal investigation has revealed transactions involving revenue equipment held for sale by the Quality Companies subsidiary that included undisclosed arrangements that overstated the values of equipment traded in those transactions. Pursuant to these transactions, the Company sold to counterparties equipment at above market prices and in return the Company paid amounts substantially in excess of the fair value of equipment purchased from those counterparties. Additionally, the written agreement governing certain of these transactions with a particular counterparty omitted material, agreed upon terms in order to enable the Company to account for those transactions as separate, independent purchases and sales, notwithstanding that they had not been negotiated as such and the stated values of a significant portion of the traded equipment was not at arm's-length values. Based on this information, the Company performed additional procedures to determine the fair value of equipment both purchased and sold and concluded that a write down of carrying values of revenue equipment held for sale of approximately $20 million is appropriate at June 30, 2016. The carrying values of this equipment will be restated to reflect management's determination of fair values at the relevant periods, which may include dates prior to June 30, 2016. The adjustment will be non-cash, and no future impact to the carrying value of this equipment is expected because all of the affected equipment was disposed of or contributed to the 19th Capital Group, LLC ("19th Capital") joint venture prior to December 31, 2016.

175.    The press release also noted expected adjustments to the Company's Element transactions and its 19th Capital investment, stating:

- Element Transactions. The Company determined that equipment transactions with Element Financial Corp. and its affiliates ("Element") and 19th Capital (prior to its recapitalization on December 30, 2016), did not sufficiently transfer the risks of ownership to qualify for sales accounting. Instead, the Company should have recorded such transactions as borrowings due to the terms of the relevant agreements, including amendments, and the manner in which the Company administered the Element transactions. Under borrowing accounting, the Company would continue to recognize equipment assets on its books and would reflect the proceeds received from Element and 19th Capital as financing obligations. The assets would continue to be depreciated, the payments would be recorded as a reduction of obligations and an increase to interest expense, amounts collected from lessees would be recorded as revenue and payments for maintenance would be expensed. The Company expects to record non-cash adjustments for the affected periods: fiscal 2014, fiscal 2015, fiscal 2016, and the first two quarters of fiscal 2017. At the end of the second quarter of fiscal 2017, borrowing treatment would cease due to the contribution of the relevant assets and liabilities to 19th Capital on December 30, 2016.

- o The balance sheet adjustments relating to these transactions are expected to result in an increase in reported asset values in our statements of financial position totaling approximately $500 million for the three-year period ended June 30, 2016. Adjustments related to liabilities are expected to result in an increase in reported values in our statements of financial position totaling approximately $700 million for the three-year period ended June 30, 2016. Adjustments for both assets and liabilities for the first two quarters of fiscal 2017 are still under review.
- o The income statement impacts relating to these adjustments are expected to reduce net income before income taxes by a range of $200-$250 million cumulatively over the three-year period ended June 30, 2016. In addition to considering the impact on these periods, the Company is reviewing the impact for the first two quarters of 2017.
- o The reversal of borrowing accounting at December 30, 2016, is expected to remove all of the assets and liabilities described above from the balance sheet and result in a significant non-cash gain due to the elimination of liabilities in excess of assets. The amount of the gain is still under review and will be offset in part by the amount by which the opening recorded value of the Company's equity investment in 19th Capital is adjusted below $100 million, as discussed below.

- 19th Capital Investment. On December 30, 2016, the Company and Element Transportation, LLC ("Element Transportation") each contributed certain assets to 19th Capital and, in exchange, each received approximately 49.9% of the equity interests in 19th Capital. Element Transportation contributed its beneficial interests in certain fleet assets, the associated lease agreements, and cash, which was immediately applied to pay down the outstanding principal balance of loans made by Element Transportation to 19th Capital. Element Transportation also made a daylight loan to 19th Capital in the amount of $31.8 million, which was used to satisfy an outstanding payable obligation to the Company. The Company contributed certain assets held for sale, leasing assets, and cash. Based upon adjustments related to equipment held for sale, including those noted above, the original $100 million recorded value of the Company's initial contribution to 19th Capital at its December 30, 2016 inception will be reduced. The Company is evaluating whether any further adjustment for items other than equipment values is appropriate. The expected total adjustment will relate to the fair values of the assets, liabilities and equity of 19th Capital contributed by both the Company and Element Transportation, the assets and liabilities retained by 19th Capital, as well as aspects of the accounting for the recapitalization of 19th Capital. The restated carrying value of the equity investment as of December 31, 2016, coupled with net losses of 19th Capital subsequent to December 31, 2016, may result in a reduction of the Company's

equity method investment to as low as zero.

176.    The press release additionally noted expected adjustments to the Company's equipment leases currently accounted for as operating leases and other expected adjustments, stating, in relevant part:

- Lease Classification.  The Company determined that a portion of the Company's equipment leases currently accounted for as operating leases should be restated as capitalized leases primarily due to the default and cross default provisions in such agreements. The affected periods include fiscal 2014, fiscal 2015, fiscal 2016, and the first two quarters of fiscal 2017, and some of such leases remain in effect. The impact on net income in any given period is not expected to be significant.  The impact on stockholders' equity is not expected to be significant because the recorded assets and liabilities are expected to be approximately equal.  The adjustment to assets and liabilities in our statements of financial position are expected to total approximately $150 million for the three-year period ended June 30, 2016.

- Other.  The Company is reviewing other accounting areas in each affected period as part of the financial restatement issuance process.  Additional items identified to date and presently under review include: (1) carrying values of, and depreciation policies applicable to, tractors and trailers used in operations, (2) reserves applicable to claims and accounts receivable, (3) foreign currency gains and losses, (4) potential impairments of property, plant and equipment related to the Element transactions, and (5) the Company's deferred income tax liability in light of the various adjustments.  Any adjustments associated with these issues could be material and some of them may impact current and future periods.

177.    The press release further commented on the cumulative effect of the needed adjustments, stating, in relevant part:

The anticipated adjustments identified above are subject to ongoing review and analysis and cannot be precisely quantified with respect to any period at this time.  However, the cumulative effect of the adjustments, along with operating losses and other expenses since the Company's last filed financial reports, are expected to reduce its reported stockholders' equity materially.  The adjustments are also anticipated to have a material impact on assets, liabilities, revenue, income (loss), and individual expense items in certain periods.

Due to the restatement issues identified above, on April 2, 2018, the Audit Committee and the Company's management concluded that the annual financial statements for the Company's 2014 and 2015 fiscal years, the unaudited quarterly reports issued during such periods, and the unaudited quarterly reports issued during fiscal 2016, should no longer be relied upon. In addition, the Company has concluded that there were deficiencies in its internal control over financial reporting that constituted material weaknesses for each of the affected periods and, as a result, management's reports on its internal control over financial reporting as of June 30, 2014, June 30, 2015, and June 30, 2016, should no longer be relied upon. The Company has engaged outside advisors to assist in remediating deficiencies in its internal control over financial reporting.

178.    The press release also noted that Celadon expects to be delisted from the NYSE, stating, in relevant part:

**Status of NYSE Listing**

The Company's continued listing on the New York Stock Exchange ("NYSE") requires that the Company cure its financial reporting filing delinquencies by May 2, 2018. Due to the number of restatement issues and the additional periods being impacted, the Company has determined that it will not be able to cure the delinquencies by the NYSE deadline. As a result, the Company expects the NYSE to halt trading of its common stock and commence the delisting process promptly. The Company currently anticipates that its common stock would be quoted on the OTC Pink market electronic quotation service operated by OTC Markets Group Inc. However, there can be no assurance that a market maker will apply to quote the Company's common stock or that the Company's common stock will become eligible for such quotation. The Company will remain subject to SEC public reporting requirements.

179.    In breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused or permitted the Company to engage in the Accounting Misconduct and make the false and misleading statements and omissions of material fact to the investing public as set forth above, and Defendant BKD aided and abetted such breach.

180.    Moreover, the Individual Defendants failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

181.     Additionally, while the Individual Defendants caused the Company's stock to be artificially inflated, four of the Individual Defendants benefitted themselves by engaging in insider sales.

182.     In further breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

## DAMAGES TO CELADON

183.     As a direct and proximate result of the Individual Defendants' conduct, Celadon will lose and expend many millions of dollars.

184.     Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and certain of the Individual Defendants, the SEC investigation, and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

185.     Such expenditures also include those associated with restating the Company's financial statements from 2014 through 2017.

186.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

187.     As a direct and proximate result of the Individual Defendants' conduct, Celadon has also suffered and will continue to suffer higher financing costs, a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

188.    Plaintiff brings this action derivatively and for the benefit of Celadon to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Celadon, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

189.    Celadon is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

190.    Plaintiff is, and he has been since during the beginning of the Relevant Period, a shareholder of Celadon.  Plaintiff will adequately and fairly represent the interests of Celadon in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

191.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

192.    A pre-suit demand on the Board of Celadon is futile and, therefore, excused.  At the time of filing of this action, the Board consists of the following six individuals: Defendants Langham, Miller, Buck, and Long (collectively, the "Director-Defendants"), and non-parties Paul Svindland and Kathleen L. Ross (together with the Director-Defendants, the "Directors").  Plaintiff needs only to allege demand futility as to three of the six Directors who are on the Board at the time this action is commenced.

193.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the Accounting Misconduct and scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while two of the Director-Defendants engaged in insider sales, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

194.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the Accounting Misconduct and the making and/or causing the Company to make the materially false and misleading statements alleged herein.   The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors.   While investors were duped into believing the fraud perpetrated by the Individual Defendants, four of the Individual Defendants sold Company stock at artificially inflated prices based on material inside information.   As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

195.    Additional reasons that demand on non-party Svindland is futile follow.  Svindland currently serves as the Company's CEO, and is thus a non-independent director.  He is entitled to receive lavish compensation, including a base salary of at least $550,000 and a $200,000 bonus. For these reasons, Svindland is not independent, and thus demand upon him is futile and, therefore, excused.

196.    Additional reasons that demand on Defendant Buck is futile follow.  Defendant Buck has served as the Company's Executive Vice President of Business Development since February 2016, and is thus, as the Company admits, a non-independent director.  Indeed, he received lavish compensation, including $460,012 in the fiscal year ended June 30, 2016.  His large Company stock holding, worth over $97,500 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible.  He conducted little, if any, oversight of the Company's engagement in the Accounting Misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  He also made false and misleading statements himself, as he signed the 2015/16 10-K.  Thus, for these reasons, too, Defendant Buck breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

197.    Additional reasons that demand on Defendant Long is futile follow.  Defendant Long has served as a Company director since December 2014 and is a member of the Compensation Committee and the Nominating and Corporate Governance Committee, and he serves as chairman of the Audit Committee.  He receives lavish compensation, including $129,752 in the fiscal year ended June 30, 2016.  His large Company stock holding, worth over $79,318 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible.  As a long-time director and chairman of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the Accounting Misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over

reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  He also made false and misleading statements himself, as he signed the 2014/15 and 2015/16 10-Ks.  Thus, for these reasons, too, Defendant Long breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

198.    Additional reasons that demand on Defendant Langham is futile follow.  Defendant Langham has served as a Company director since July 2007 and is a member of the Audit Committee and the Compensation Committee, and she serves as the chairman of the Nominating and Corporate Governance Committee.  She receives lavish compensation, including $128,502 in the fiscal year ended June 30, 2016.  Her large Company stock holding, worth over $276,182 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible.  As a long-time director and member of the Audit Committee, she conducted little, if any, oversight of the Company's engagement in the Accounting Misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Defendant Langham's insider sale before the fraud was exposed, which yielded over $103,320 in proceeds, demonstrates her motive in facilitating and participating in the fraud.  She also made false and misleading statements herself, as she signed the 2013/14, 2014/15, and 2015/16 10-Ks.  Thus, for these reasons, too, Defendant Langham breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

- 76 -

199.    Additional reasons that demand on Defendant Miller is futile follow.  Defendant Miller has served as a Company director since February 1992 and serves as the Board's lead independent director, as a member of the Audit Committee and the Nominating and Corporate Governance Committee, and as chairman of the Compensation Committee.  He receives lavish compensation, including $144,752 in the fiscal year ended June 30, 2016.  His large Company stock holding, worth over $344,299 before the fraud was exposed, reveals his interest in keeping the Company's stock price as high as possible. As a long-time director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the Accounting Misconduct and scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  Defendant Miller's insider sales before the fraud was exposed, which yielded over $865,202 in proceeds, demonstrate his motive in facilitating and participating in the fraud.  He also made false and misleading statements himself, as he signed the 2013/14, 2014/15, and 2015/16 10-Ks.  Thus, for these reasons, too, Defendant Miller breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

200.    Additional reasons that demand on the Board is futile follow.

201.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  In fact, two of the Directors have served on the Board for over a decade.  These conflicts of interest precluded the Directors from adequately

monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

202.     Director-Defendants Langham, Miller, Buck, and Long were each on the Board when the transactions involving Element and 19th Capital discussed herein occurred, and they approved these transactions—despite that they are not the product of legitimate business judgment. Director-Defendants Langham, Miller, Buck, and Long also approved the creation of 19th Capital, which diverted important assets from Celadon, and provided Defendants Will, Meek, and Peavler Class B Interests in 19th Capital that impacted their financial incentives and ability to disinterestedly manage the Company and put the interests of Celadon and its shareholders first and foremost.   Thus, Director-Defendants Langham, Miller, Buck, and Long face a substantial likelihood of liability, and demand is excused as to them.

203.     The Director-Defendants violated Section 14(a) of the Exchange Act by at least negligently making the false and misleading statements and omissions in the 2014-2016 Proxy Statements.  Thus, the Director-Defendants face a substantial likelihood of liability, and demand upon them would be futile.

204.     In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act.  In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid

conflicts of interest and unlawful insider trading, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.  Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

205.    Two of the Director-Defendants sold shares of Celadon common stock while the price of the Company's stock was artificially inflated due to the Individual Defendants false and misleading statements.  Thus, they face a substantial likelihood of liability and demand is futile as to them.

206.    Celadon has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Celadon any part of the damages Celadon suffered and will continue to suffer thereby.  Thus, any demand upon the Directors would be futile.

207.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

208.    The acts complained of herein constitute violations of fiduciary duties owed by Celadon's officers and directors, and these acts are incapable of ratification.

209.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Celadon.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the officers of Celadon, there would be no directors' and officers' insurance protection.  Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery.  Thus, demand on the Directors is futile and, therefore, excused.

210.    If there is no directors' and officers' liability insurance, then the Directors will not cause Celadon to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

211.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

212.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

213.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

214.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

215.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

216.    Under the direction and watch of the Directors, the 2014 Proxy Statement failed to disclose: (1) the Accounting Misconduct; (2) that Celadon's financial statements issued in the year

2014 contained knowing errors that would necessitate restatements; and (3) that the Company failed to maintain internal controls.

217. Under the direction and watch of the Directors, the 2015 Proxy Statement failed to disclose: (1) the Accounting Misconduct; (2) the investigation by the SEC into the Company's accounting practices; (3) that Celadon's financial statements issued in the years 2014 and 2015 contained knowing errors that would necessitate restatements; and (4) that the Company failed to maintain internal controls.

218. Under the direction and watch of the Directors, the 2016 Proxy Statement failed to disclose: (1) the Accounting Misconduct; (2) the investigation by the SEC into the Company's accounting practices; (3) that Celadon's financial statements issued in the years 2014, 2015, and 2016 contained knowing errors that would necessitate restatements; and (4) that the Company failed to maintain internal controls.

219. Moreover, the 2014-2016 Proxy Statements were false and misleading in discussing the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failure to abide by them and to their making and or permitting the Company to make the false and misleading statements and omissions of material fact referenced herein and to engage in the Accounting Misconduct.

220. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2014-2016 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder

determination in the 2014-2016 Proxy Statements, including election of directors and advisory approval of executive compensation.

221.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2014-2016 Proxy Statements.

222.    Plaintiff on behalf of Celadon has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

223.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

224.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Celadon's business and affairs.

225.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

226.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Celadon.

227.    In breach of their fiduciary duties owed to Celadon, the Individual Defendants engaged in and/or caused the Company to engage in the Accounting Misconduct.

228.    In further breach of their fiduciary duties owed to Celadon, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose: (1) the Accounting Misconduct;

(2) the investigation by the SEC into the Company's accounting practices; (3) that Celadon's financial statements issued in the years 2014, 2015, 2016, and 2017 contained knowing errors that would necessitate restatements; and (4) that the Company failed to maintain internal controls.

229.    The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

230.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

231.    Additionally, four of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact referenced herein.

232.    The Individual Defendants had actual or constructive knowledge that the Company engaged in the Accounting Misconduct and issued materially false and misleading statements, and they they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.    Such material misrepresentations and omissions were made knowingly or recklessly and for the purpose and effect of artificially inflating the price of Celadon's securities and disguising insider sales.

233.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls.  The Individual Defendants had actual knowledge that the Company

- 84 -

was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Celadon's securities and engaging in insider sales.

234.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

235.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Celadon has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

236.   Plaintiff on behalf of Celadon has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

237.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

238.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Celadon.

239.   The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Celadon that was tied to the

performance or artificially inflated valuation of Celadon, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

240.     Plaintiff, as a shareholder and a representative of Celadon, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

241.     Plaintiff on behalf of Celadon has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

242.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

243.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Celadon, for which they are legally responsible.

244.     As a direct and proximate result of the Individual Defendants' abuse of control, Celadon has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Celadon has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

245.     Plaintiff on behalf of Celadon has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

246.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

247.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Celadon in a manner consistent with the operations of a publicly-held corporation.

248.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Celadon has sustained and will continue to sustain significant damages.

249.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

250.    Plaintiff on behalf of Celadon has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

251.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

252.    The Individual Defendants caused the Company to pay themselves excessive salaries, bonuses, fees, and stock grants to the detriment of the shareholders and the Company.

253.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Celadon to waste valuable

corporate assets, to incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

254.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

255.    Plaintiff on behalf of Celadon has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendant BKD for Aiding and Abetting the Individual Defendants' Misconduct

256.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

257.    Defendant BKD aided and abetted the Individual Defendants who breached their fiduciary duty to Celadon.

258.    Defendant BKD's misconduct resulted in continuous, connected, and on-going harm to the Company.

259.    Specifically, Defendant BKD engaged in and helped facilitate the Accounting Misconduct and was aware of the Individual Defendants' misconduct as discussed herein.

260.    Defendant BKD is jointly and severally liable to the same extent as any other Individual Defendant is liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

261.    As a direct and proximate result of Defendant BKD's aiding and abetting of Celadon's directors' and officers' breaches of duty alleged herein, Celadon has sustained and will continue to sustain substantial damages.

262.     Plaintiff on behalf of Celadon has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Celadon, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached their fiduciary duties to Celadon, and that Defendant BKD aided and abetted such breach;

(c)     Determining and awarding to Celadon the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Celadon and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Celadon and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Celadon to nominate at least three candidates for election to the board; and

    3.  a proposal to ensure the establishment of effective oversight of compliance

with applicable laws, rules, and regulations.

    (e)      Awarding Celadon restitution from each of the Individual Defendants;

    (f)      Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)      Granting such other and further relief as the Court may deem just and

proper.

Dated: May 8, 2018                Respectfully submitted,

**SHARTZER LAW FIRM, LLC**


/s/ Jason A. Shartzer
Jason A. Shartzer, Atty. No. 23989-49
156 E. Market Street, Suite 1000
Indianapolis, IN 46204
Telephone: (317) 969-7600
Facsimile: (317) 969-7650
Email: jshartzer@shartzerlaw.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

- 90 -